**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Paul Howard GUMERLOCK,
Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Marc Paul FANNON,
Defendant-Appellant.**

Nos. 76–2732, 76–2700.

United States Court of Appeals,
Ninth Circuit.

Feb. 2, 1979.

---

Frank J. Ragen (argued), Baxley, Ragen & Ray, San Diego, Cal., on brief; Donald A. Nunn (argued), San Diego, Cal., for defendant-appellant.

Joseph Davies, Jr., Atty., Washington, D. C. (on the brief), Terry J. Knoepp, U. S. Atty., San Diego, Cal., Joseph Davies, Jr. (argued), Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before BROWNING, ELY, HUFSTEDLER, WRIGHT, TRASK, CHOY, GOODWIN, WALLACE, SNEED, KENNEDY, ANDERSON, HUG and TANG, Circuit Judges.

BROWNING, Circuit Judge:

Heroin was discovered in packages delivered to United Airlines by appellants for shipment. Appellants were charged with possession and conspiracy to possess in violation of 21 U.S.C. §§ 841(a)(1) and 846; their motions to suppress were denied and they were convicted.

On appeal, a panel of this court held the search of appellants' packages to have been governmental, rather than private, and therefore subject to Fourth Amendment requirements, which had not been met. *United States v. Fannon,* 556 F.2d 961 (9th Cir. 1977). It was undisputed that the packages

were searched solely by United Airlines' employees, and that until the heroin was turned over to federal law enforcement officers no government official was involved. (*Id.* at 963.) The panel held, however, that section 204 of the Air Transportation Security Act of 1974, Pub.L. No. 93–366, Title II, 88 Stat. 415 (codified at 49 U.S.C. § 1511 (Supp. V, 1975)), subjected airfreight shipments such as these to "the government's administrative scheme to strengthen the security of air transportation" (*id.* at 965); and that searches conducted pursuant to this government mandated program are subject to the Fourth Amendment, citing *United States v. Davis,* 482 F.2d 893 (9th Cir. 1973).

◼ We took the case en banc to consider the panel's holding. We conclude that Congress did not intend to require that airfreight shipments be subjected to the security screening process mandated by the government for passengers and their carryon possessions. In any event, airfreight shipments are not subject to such a process, and, in particular, the two packages involved in this case were not examined as part of a government mandated security program. On the contrary, the search of these packages was a private one, conducted by the air carriers' employees without government intervention, and is therefore not subject to the Fourth Amendment.

The Air Transportation Security Act of 1974 is the second title of a two-title statute. The statute as a whole is directed to the problem of air piracy or hijacking.[1] Title I, the "Anti-hijacking Act of 1974," is designed to implement the Convention for the Suppression of Unlawful Seizure of Aircraft (the Hague Convention). *See* H.R. Rep. No. 885, 93d Cong., 2d Sess. 9 (1974). Title II, the "Air Transportation Security Act of 1974," is intended to provide security "against acts of criminal violence against air transportation through the imposition at airports in the United States of such measures as the screening of passengers." *Id.* Committee reports and debates alike reflect a purpose to prevent the seizure of aircraft, primarily by subjecting passengers and their carryon possessions to a preboarding screening search to prevent the introduction of weapons and explosives into the cabin of aircraft.[2]

Section 202 of Title II requires a preboarding search of passengers and their carryon possessions for weapons and explosives. The administrator of the Federal Aviation Administration is directed to "prescribe or continue in effect reasonable regulations requiring that all passengers and all property intended to be carried in the aircraft cabin in air transportation or intrastate air transportation be screened by weapon-detecting procedures or facilities employed or operated by employees or agents of the air carrier . . . prior to boarding the aircraft." 49 U.S.C. § 1356(a).

The purpose of this provision is to ratify regulations already issued by the administrator of FAA requiring air carriers to institute a preboarding screening program.[3] The pre-statutory screening program thus legislatively approved was the program dealt with in *United States v. Davis,* 482 F.2d 893 (9th Cir. 1973).

It is clear from the language of section 202, from references to this provision in the legislative history,[4] from the administrative background of the ratified regulations out-

---

1. Conf.Rep. No. 1194, 93d Cong., 2d Sess. 13 (1974), *reprinted in* 1974 U.S.Code Cong. & Admin.News, pp. 3975, 3996; S.Rep. No. 13, 93 Cong., 1st Sess. 1 (1973); H.R.Rep. No. 885, 93d Cong., 2d Sess. 1 (1974).

2. *See, e. g.,* S.Rep. No. 13, 93 Cong., 1st Sess. 1–2 (1973); H.R.Rep. No. 885, 93d Cong., 2d Sess. (1974) 9–10; Conf.Rep. No. 1194, 93d Cong., 2d Sess. 20–21 (1974), *reprinted in* 1974 U.S.Code Cong. & Admin.News, pp. 3996, 4003–04; 119 Cong.Rec. 4917, 4921, 4922, 4923 (1973); 120 Cong.Rec. 6521, 24747 (1974).

3. H.R.Rep. No. 885, 93d Cong., 2d Sess. 10 (1974); Conf.Rep. No. 1194, 93d Cong., 2d Sess. 20–21 (1974), *reprinted in* 1974 U.S.Code Cong. & Admin.News, pp. 3996, 4003–04; 119 Cong.Rec. 4921 (1973); 120 Cong.Rec. 6524, 23649, 24747 (1974).

4. S.Rep. No. 13, 93 Cong., 1st Sess. 1–2, 8, 10 (1973); H.R.Rep. No. 885, 93d Cong., 2d Sess. 10 (1974); Conf.Rep. No. 1194, 93d Cong., 2d Sess. 20–21 (1974), *reprinted in* 1974 U.S.Code Cong. & Admin.News, pp. 3996, 4003–04; 119

lined in *Davis*,[5] and from the express language of the ratified regulations themselves,[6] that this screening program was concerned only with passengers and the possessions they carried aboard the aircraft, and not with airfreight.

Appellants do not argue to the contrary. Instead, they rely upon section 204 of the statute, 49 U.S.C. § 1511,[7] as did the panel opinion.

Section 204 does not in terms authorize or require searches by air carriers. Subsection (a) directs the administrator to require air carriers to refuse to transport passengers or property if consent to search is refused. The search referred to in subsection (a) of section 204 is the screening search required by section 202 (49 U.S.C. § 1356(a)), which, as we have seen, is limited to passengers and their carryon possessions;[8] neither appellants, nor the panel, rely upon subsection (a) as a basis for extending the government mandated screening search program to airfreight.

Appellants imply such an extension from subsection (b) of section 204. Subsection

---

Cong.Rec. 4917, 4921, 4922, 4923 (1973); 120 Cong.Rec. 24747 (1974).

**5.** *United States v. Davis*, 482 F.2d 893, 898–902 (9th Cir. 1973).

**6.** The regulations in force at the time of the searches on March 8 and 9, 1976 were codified at 14 C.F.R. § 121.538 (1976), and read in pertinent part:

§ 121.538 Aircraft security.

(a) . . ..

(b) Each certificate holder shall, before February 6, 1972, adopt and put into use a screening system, acceptable to the Administrator, that is designed to prevent or deter the carriage aboard its aircraft of any explosive or incendiary device or weapon in carryon baggage or on or about the persons of passengers, except as provided in § 121.585. Each certificate holder shall immediately adopt and put into use its security program prescribed in paragraph (c) of this section.

(c) Each certificate holder shall prepare in writing and submit for approval by the Administrator its security program including the screening system prescribed in paragraph (b) of this section, and showing the procedures, facilities, or a combination thereof, that it uses or intends to use to support that program and that are designed to—

(1) Prevent or deter unauthorized access to its aircraft;

(2) Assure that baggage is checked in by a responsible agent or representative of the certificate holder;

(3) Prevent cargo and checked baggage from being loaded aboard its aircraft unless handled in accordance with the certificate holder's security procedures; and

(4) Assure that only persons authorized under § 121.585(a) are permitted to have on or about their persons or property a deadly or dangerous weapon accessible to them while aboard any of its aircraft.

The present version of these regulations is essentially the same, *see* 14 C.F.R. § 121.538

(1978). The few relevant changes are discussed below at pp. 798–799.

**7.** Section 204 reads in full:

(a) The Administrator shall, by regulation, require any air carrier, intrastate air carrier, or foreign air carrier, to refuse to transport—

(1) any person who does not consent to a search of his person, as prescribed in section 1356(a) of this title, to determine whether he is unlawfully carrying a dangerous weapon, explosive, or other destructive substance, or

(2) any property of any person who does not consent to a search or inspection of such property to determine whether it unlawfully contains a dangerous weapon, explosive, or other destructive substance.

Subject to reasonable rules and regulations prescribed by the Administrator, any such carrier may also refuse transportation of a passenger or property when, in the opinion of the carrier, such transportation would or might be inimical to safety of flight.

(b) Any agreement for the carriage of persons or property in air transportation or intrastate air transportation by an air carrier, intrastate air carrier, or foreign air carrier for compensation or hire shall be deemed to include an agreement that such carriage shall be refused when consent to search such persons or inspect such property for the purposes enumerated in subsection (a) of this section is not given.

49 U.S.C. § 1511 (Supp. V, 1975).

**8.** Subsection (a)(1) states that the search of persons referred to is the screening search required by section 202 of the Anti-Hijacking Act, 49 U.S.C. § 1356(a) (Supp. V, 1975). Subsection (a)(2) relating to searches of property does not contain this express limitation. However, the regulations issued under the statute indicate that this limitation is to be implied. *See* 41 Fed.Reg. 30106 (1976) adding subsection (k) (set out in note 10, *infra*) to 14 C.F.R. § 121.-538. This is consistent with the overall purpose and structure of the statute.

(b) provides that any agreement for carriage of persons or property by air for compensation "shall be deemed to include an agreement that such carriage shall be refused when consent to search such persons or inspect such property for the purposes enumerated in subsection (a) of this section is not given." This subsection, like subsection (a), seems to apply only to screening searches of passengers and their possessions, and not to inspection of airfreight. The structure and purpose of the statute strongly suggest it. Moreover, there was no need to grant air carriers the right to refuse to transport freight unless the shipper consented to inspection—that right had been long and firmly established in carrier tariffs and by common law.[9]

But whatever Congress may have intended to accomplish by subsection (b) of section 204, the Federal Aviation Administration has not included "airfreight shipments within the reach of an administrative scheme designed to enhance the security of air transportation from acts of criminal violence," *United States v. Fannon,* 556 F.2d at 964–65,—much the less within the reach of an administrative scheme that involves opening and inspecting the contents of airfreight shipments.

Nor do the three amendments to the relevant regulations issued since the passage of the 1974 Act extend the government mandated security program to airfreight shipments. On April 12, 1975, the administrator modified various sections of Part 121 of the Federal Aviation Regulations to provide rules for carriage of deadly weapons and persons in custody. 40 Fed.Reg. 17551.[10] These rules are directed primarily to assuring that no weapons are available to passengers in flight. *Id.* The rules also prohibit carriers from knowingly allowing dangerous weapons in checked luggage, unless prescribed conditions are met;[11] but the administrator expressly disavowed any intention to require carrier inspection of checked baggage, *id.* at 17552. Freight shipments are not mentioned. Almost a year later, on March 12, 1976 (after the searches in this case), the administrator amended the regulations to extend the screening procedures to checked baggage. 41 Fed.Reg. 10911.[12] Again, there is no reference to airfreight. Finally, on July 15, 1976, the administrator added subparagraph (k) to 14 C.F.R. § 121.538, directly responsive to subsection (a) of section 204 of the 1974 Act. 41 Fed.Reg. 30106.[13] By the

---

**9.** *See United States v. Pryba,* 163 U.S.App.D.C. 389, 396–399, 502 F.2d 391, 398–401, and authorities cited, 163 U.S.App.D.C. at 397, 502 F.2d at 399 n.48 (1974). *See also United States v. DeBerry,* 487 F.2d 448, 449 n.1 (2d Cir. 1973); *United States v. Cangiano,* 464 F.2d 320, 324 (2d Cir. 1972); *Gold v. United States,* 378 F.2d 588, 599 (9th Cir. 1967); *United States v. Blum,* 329 F.2d 49, 52 (2d Cir. 1964).

The panel opinion states that "Congress supplanted whatever common law power of search air carriers may have had and subjected such searches to the Fourth Amendment's standard of reasonableness." 556 F.2d at 965. If this were correct, then any freight inspection by an air carrier—for whatever purpose—would be subject to the Fourth Amendment. It is unlikely that Congress would work such a fundamental change in the law entirely by implication and with no comment at all.

**10.** For the text of the regulations as codified, *see* 14 C.F.R. § 121.538(c)(4) (set out in note 6, *supra*), § 121.575(b), § 121.584, § 121.585 (1978).

**11.** *See* 14 C.F.R. § 121.585(b) (1978).

**12.** Codified at 14 C.F.R. § 121.538(b) (1978), which reads in full:

(b) Each certificate holder shall adopt and put into use a screening system, acceptable to the Administrator, that is designed to prevent or deter the carriage aboard its aircraft of any explosive or incendiary device or weapon in carry-on baggage or on or about the persons of passengers, except as provided in § 121.585, and the carriage of any explosive or incendiary device in checked baggage. Each certificate holder shall adopt and put into use its security program prescribed in paragraph (c) of this section.

*Compare,* the version in force at the time of the searches, set out in note 6, *supra.*

**13.** The added subsection reads:

§ 121.538 Aircraft security.

\*    \*    \*    \*    \*    \*

(k) Each certificate holder shall refuse to transport—

(1) Any person who does not consent to a search of his person in accordance with the screening system prescribed by paragraph (b) of this section; and

(2) Any property of any person who does not consent to a search or inspection of that

express terms of the new regulation, the carrier's obligation not to carry persons or property applies when consent is refused to search in accordance with the screening system prescribed in subparagraph (b) of section 121.538. And as we have seen,[14] the system mandated by section 121.538(b) is expressly confined to passengers, their possessions, and, at the time the amendment was adopted, to checked luggage. It does not apply to airfreight.

■ It is true that from the inception, the government mandated airport screening program was only one element of a broader security program each carrier was required to adopt and submit to the administrator for approval. 14 C.F.R. § 121.538(c) (1976) (set out in note 6). This regulation does not specify the other elements of this larger security program, except that the program is to be designed to accomplish certain listed objectives. One of these is to "[p]revent cargo and checked baggage from being loaded aboard the aircraft unless handled in accordance with the certificate holder's security procedures." 14 C.F.R. § 121.-538(c)(3). This is the only mention of cargo in the regulation. This provision does not require carriers to adopt any particular security procedures with respect to cargo; specifically, it does not require inspection of cargo.[15] There is nothing in the record to indicate whether United Airlines in fact adopted any security procedures with- respect to cargo, or, if it did, whether the procedures include inspections approved by the administrator. Since the burden of establishing government involvement in the search of their packages rests upon appellants,[16] we must assume that United Airlines has not adopted such a system in response to section 121.538(c)(3) which subjects airfreight to security searches.

The circumstances surrounding the searches in this case confirm the absence of any governmental scheme of airfreight inspections. There were no screening devices available in the airfreight office. The freight agents had received no instructions from the law enforcement agencies regarding the opening of packages. Each of the freight agents testified that in order to enter the contents of the packages on the bill of lading, he asked the shipper what the package contained. Because the shipper's nervousness and other circumstances peculiar to the particular incident led him to suspect that the package contained something other than the shipper declared, each agent sought permission from his supervisor to open the package and inspect its contents. No law enforcement personnel were present before or during the opening of the packages. Each agent testified he acted pursuant to a tariff provision that he understood authorized inspection in such circumstances.[17]

---

property in accordance with the screening system prescribed by paragraph (b) of this section.

**14.** See note 6, supra, and accompanying text.

**15.** Section 121.538(c)(3) refers to "checked baggage" as well as to cargo. In extending mandatory screening procedures to checked baggage, the administrator noted that 121.538 "did not presently require the screening system for checked baggage." 41 Fed.Reg. 10911. By the same token, it would not apply to cargo.

**16.** United States v. Freeland, 562 F.2d 383, 385 (6th Cir. 1977). See Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939). See also United States v. Sand, 541 F.2d 1370, 1375 (9th Cir. 1976); United States v. Shea, 436 F.2d 740, 741 (9th Cir. 1970).

**17.** Both agents testified they acted pursuant to Rule 24 of CAB Tariff 96, which provides that "[a]ll shipments are subject to inspection by the carrier but the carrier shall not be obligated to perform such inspections." Searches by airfreight carriers conducted pursuant to tariff regulations in which government agents have not otherwise been involved have consistently been held "non-governmental" for purposes of the Fourth Amendment. E. g., United States v. Ford, 525 F.2d 1308, 1311 (10th Cir. 1975); United States v. Issod, 508 F.2d 990, 994 (7th Cir. 1974); United States v. DeBerry, 487 F.2d 448, 450 (2d Cir. 1973); United States v. Pryba, 163 U.S.App.D.C. 389, 397–401, 502 F.2d 391, 399–401 & n.61 (1974); United States v. Ogden, 485 F.2d 536, 538–39 (9th Cir. 1973); United States v. Cangiano, 464 F.2d 320, 324–25 (2d Cir. 1972); Gold v. United States, 378 F.2d 588 (9th Cir. 1967). Cf. Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) (utility company's termination of service to a customer pursuant to tariff filed with state regulatory agency not government action).

Appellants argue that the scope of the searches indicate the agents' purpose was not to verify the declaration of contents of the packages nor vindicate any other private interest of the airline,[18] but to search for contraband in aid of law enforcement. Assuming the searches were undertaken in whole or in part to find narcotics, the airline employees acted officiously and not at the behest of the government. A private search in which the government is in no respect involved—either directly as a participant or indirectly as an encourager—is not subject to the Fourth Amendment because the private actor is motivated in whole or in part by a unilateral desire to aid in the enforcement of the law.[19]

Affirmed.

ELY, Circuit Judge (dissenting):

I respectfully dissent. Federal regulations require airlines to prepare a security program that includes airfreight within its scope. 14 C.F.R. § 121.538(c)(3); *see also* §§ 121.538(e) and (g) (pertaining to FAA Administrator approval, modification, and amendment of airline security programs). If the challenged inspection in this case were conducted pursuant to such a security program, then I believe that the inspection

18. When the agents opened the packages the contents appeared to correspond with the declaration: "tape recordings," in one instance, "cassette tapes," and a telescope in the other. The heroin was discovered only by a further inspection of the contents. The record is not entirely clear, but one of the agents may have opened several smaller containers within the outer package and found them to contain tape recordings before he reached and opened the container containing the heroin.

19. *United States v. Sherwin*, 539 F.2d 1, 6 & n.6 (9th Cir. 1976) (en banc); *United States v. Newton*, 510 F.2d 1149, 1153 (7th Cir. 1975).

Appellants rely upon *Gambino v. United States*, 275 U.S. 310, 48 S.Ct. 137, 72 L.Ed. 293 (1927), and *Corngold v. United States*, 367 F.2d 1 (9th Cir. 1966) for the proposition that a private search devoid of "prior or contemporaneous governmental involvement," *United States v. Sherwin, supra*, at 6, conducted in aid of law enforcement is sufficient to subject the search to Fourth Amendment limitations. In *Gambino*, defendants were arrested by state troopers who conducted a warrantless search of their automobile and seized liquor possessed in violation of the National Prohibition Act. The defendants were not violating any state laws; the state prohibition act had been repealed earlier. However, the Governor of New York had ordered all state officers to aid in enforcement of the federal law. "Aid so given was accepted and acted on by the federal officials." 275 U.S. at 315, 48 S.Ct. at 138. The court concluded that "[t]he prosecution thereupon instituted by the federal authorities was, as conducted, in effect a ratification of the arrest, search and seizure made by the troopers on behalf of the United States." *Id.* at 316–317, 48 S.Ct. at 138. Thus *Gambino* did not involve a *unilateral* private purpose to assist the government. Rather, state and federal officials had developed a course of cooperation in enforcing the liquor laws that ensuing federal prosecution was in effect a "ratification" of the prior state search and seizure.

In *Corngold*, the court relied upon the agent's testimony that he had opened the package only because of the request by government officials. 367 F.2d at 5. In addition to inducing the airline employee to open the packages under the authority of the tariff regulation, the customs agents held open the flaps of the large packages, and opened and inspected the contents of the small boxes which it contained. An agent wrote his initials on the inside of the lids of several of the small packages. *Id.* at 4. Thus, there was direct, contemporaneous government involvement in the private search.

Finally, appellants rely upon *United States v. Krell*, 388 F.Supp. 1372 (D.Alaska 1975). Dictum from that case can be cited for the proposition that a private search solely for the purpose of turning drugs over to the police is for that reason alone subject to the Fourth Amendment. However, *Krell* did not involve a search unsolicited by government. On the contrary, the two airfreight agents had been alerted by the police two weeks earlier to be on the lookout for drug shipments. Prior to opening the packages, the agents informed the police that they suspected a package left for shipment contained drugs. When the police arrived, the police stated they could not open the package without a warrant, but reminded the airfreight agents that they had the right to inspect it for mislabeling. The airfreight agents then opened the packages and exhibited the contents to the police, including a glass jar containing marihuana. The police opened another inner container whose contents could not be determined from the outside. Thus in *Krell*, as in *Gambino* and *Corngold*, there was "prior or contemporaneous governmental involvement" in the search.

fell within "the government's administrative scheme to strengthen the security of air transportation." *United States v. Fannon*, 556 F.2d 961, 965 (9th Cir. 1977). As such, it would be subject to the Fourth Amendment. *United States v. Davis*, 482 F.2d 893, 904 (9th Cir. 1973). On the other hand, if the inspection were not conducted as a part of, or pursuant to, an approved security program, then I do not believe that it would have been within the ambit of a governmental scheme. In such event, the inspection would not, I think, be subject to Fourth Amendment restrictions. *See United States v. Sherwin*, 539 F.2d 1, 5–6 (9th Cir. 1976) (en banc).

The factual record before us does not indicate whether United Airlines operated under an approved security program, or if it did so operate, whether the inspection here involved was conducted pursuant to that program. Without this critical information, I cannot determine which rule of law should properly be applied. In short, I submit that the majority is issuing a significant opinion without the benefit of factual determinations that it should have required. Accordingly, I would remand the cause so as to allow the District Court to make the critical factual decisions that I find lacking in the present record.

HUFSTEDLER, Circuit Judge, dissenting.

I agree with the majority's conclusion that "Congress did not intend to require that aircraft shipments be subjected to the security screening process mandated by the Government for passengers and their carry-on possessions," but the conclusion is not relevant in deciding the issue before us. The question is not whether Congress mandated a particular kind of security screening process for cargo, but whether Congress mandated the adoption of security screening procedures. If Congress directed airlines to undertake such measures, then searches conducted pursuant to that mandate are within "the government's administrative scheme to strengthen the security of air transportation" (*United States v. Fan-*

*non* (9th Cir. 1977) 556 F.2d 961, 965), and they are subject to the Fourth Amendment. (*United States v. Davis*, (9th Cir. 1973) 482 F.2d 893.)

The federal regulations did mandate security procedures for cargo within 14 C.F.R. § 121.538(c), which provides in pertinent part that "[e]ach certificate holder shall prepare in writing and submit for approval by the Administrator its security program including the screening system prescribed in paragraph (b) of this section, and showing the procedures, facilities, or a combination thereof, that it uses or intends to use to support that program and that are designed to ·

"

"(3) Prevent cargo . . . from being loaded aboard its aircraft unless handled in accordance with the certificate holder's security procedures . . .."

The majority reasons that this mandate does not count because (1) the record does not reveal whether United Airlines complied with the mandate by adopting security measures with respect to cargo and, therefore, "we must assume that United Airlines has not adopted such a system," and (2) the regulation does not specifically require inspection of cargo.

In the first place, I do not believe that we have any reason to assume that United Airlines disobeyed the law by failing to adopt procedures in compliance with 14 C.F.R. § 121.538(c) to prevent dangerous cargo from being loaded aboard its aircraft. We should never lightly infer that even unsophisticated persons disobey the law. Furthermore, the self-interest of airlines in protecting their own aircraft and passengers who use their facilities would lead to a contrary inference. If there were any doubt upon this question, the appropriate procedure would be to remand the case to the district court for the purpose of ascertaining the existence of such security program, either by the introduction of evidence or by appropriate mechanisms for taking judicial notice of documents filed with the public agency.

In the second place, the airline instituted security procedures, even if it did not undertake the paperwork envisioned by the federal regulations. I do not understand why security procedures thus used can be deemed outside the "nationwide, anti-hijacking program conceived, directed, and implemented by federal officials in cooperation with air carriers." (*United States v. Davis, supra,* 482 F.2d at 897.) As we said in *Davis,* there is governmental action when private persons and the Government engage in a joint activity. Under such circumstances, "the United States has 'significantly involved itself' in airport searches from the beginning." (*Id.* at 897.)

Finally, it should be immaterial whether the federal regulation particularly prescribes the manner of conducting a security screening process for cargo. Whether the method is by opening all the packages and luggage or using some kind of a mechanical device, the airline is pursuing a security program which has been mandated by federal regulations. It should be obvious that, in absence of mechanical screening devices, the only available method is to open the cargo packages to detect explosives or incendiary devices. We can surely judicially notice that, even in respect of carry-on baggage, air carriers that do not have functioning mechanical screening devices, use airline personnel to open carry-on packages and luggage. No different method is available when packages are shipped as cargo, rather than as carry-on articles.

I adhere to the views that the panel expressed in *United States v. Fannon, supra.*