166 N.J. Super. 504 (1979)
400 A.2d 109
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
ROBERT THOMAS POHLE AND ROBERT CAPUTI, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Submitted December 18, 1978.
Decided March 19, 1979.
*506 Before Judges CONFORD, PRESSLER and KING.
Mr. John H. Stamler, Union County Prosecutor, attorney for appellant (Mr. Robert D. Clarke, Assistant Prosecutor, of counsel and on the brief).
Mr. Stanley C. Van Ness, Public Defender, attorney for respondents (Mr. Paul M. Klein, Assistant Deputy Public Defender, of counsel and on the brief).
Mr. Edward Goldberg, attorney for defendant Robert T. Pohle.
The opinion of the court was delivered by CONFORD, P.J.A.D. (retired; temporarily assigned).
This appeal primarily implicates the question whether a 1977 inspection and search of an air freight shipment by an airlines employee is to be regarded as a governmental search for constitutional purposes. Our determination of the question is in the negative, and we reverse an order to suppress evidence based on a contrary ruling in the Law Division. 160 N.J. Super. 576 (1978).
Defendants were indicted for the unlawful possession of methoqualone, a controlled dangerous substance, and for possession thereof with intent to distribute. The indictment *507 arose out of the facts accurately stated in the Law Division as follows:
Based on evidence presented at the second hearing, I find the following occurred in Los Angeles. United offers Small Package Dispatch ("SPD") airflight service, which provided speedy and predictable carriage of small packages in the baggage compartments of regularly scheduled passenger planes. SPD is available only for packages weighing less than 50 pounds and having a value between $50 and $500 that are given to United no later than 30 minutes before departure of the flight to which they are assigned.
A United clerk received the package in question from a young man ("shipper") who, in accordance with long-standing tariff regulations, declared its contents and value. The declaration is necessary not only to compute the rate, but also to identify cargo that a shipper might not realize is dangerous, such as a battery containing acid. The shipper declared the contents to be clothing, including shoes, and their value to be $50, the minimum. The clerk computed the fee to be $38.50, which the shipper paid. Because the clerk's suspicions were aroused, he asked for the shippers' driver's license and noted its number. Two things bothered the clerk: the package seemed too small to contain shoes and its declared value too modest to warrant the expense of shipping it SPD.
After waiting on some other customers, the clerk took the package to an X-ray machine. The machine disclosed the contents to be three lightly outlined shapes that later turned out to be two bags, each containing about 500 tablets, and a bundle of bills totaling $5,000. The clerk was satisfied that the shapes were not shoes  they did not look like shoes and there was no sign of metal that might have been nails or buckles. There was nothing on the X-ray screen even so dense as to indicate a leather sole.
The clerk turned over the package to his supervisor, Charles Knudson, who opened the package, removed its contents, telephoned the Los Angeles police, and notified his Newark office to advise anyone who showed up for the package that it was lost. The police took custody of the package and its contents. Two days later they arranged for the controlled delivery previously described.
[160 N.J. Super. at 585-586]
The court's description of the "controlled delivery" was as follows:
The Los Angeles police arranged for the pilot of the plane to deliver the package to the federal agents at Newark. The agents arranged *508 for the addressee to pick up the package at the airline counter where it would ordinarily be claimed.
Everything went according to plan. Defendant Pohle claimed the package and walked hurriedly out of the building, the agents following discreetly behind. As Pohle entered a waiting car operated by defendant Caputi, the agents placed them both under arrest and seized the package from Pohle. An hour after the arrest the agents opened the package and found the contents to be as described by the Los Angeles police. No warrant had been obtained to search the package.
[Id. at 581-582]
The State opposed the motion to suppress the contents of the package on standing and substantive grounds. We are in agreement with the trial court's pertinent reasoning and conclusion that defendants had standing to challenge the search on the ground of their possessory or proprietary interest in the package when searched in California. 160 N.J. Super. at 584-585. See also United States v. Chadwick, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); Rakas v. Illinois, ___ U.S. ___, 99 S.Ct. 421, 436, 58 L.Ed.2d 387, 408 (1978) (reference to Chadwick case, supra, in concurring opinion of Powell, J.).
The trial court found the search to be one by the government, rather than by the airline, for Fourth Amendment purposes, because governmental involvement in the search was "significant," citing United States v. Davis, 482 F.2d 893 (9 Cir.1973), and United States v. Fannon, 556 F.2d 961 (9 Cir.1977). The latter case, however, has just been overruled on reconsideration by the Ninth Circuit Court en banc, sub nom. United States v. Gumerlock, 590 F.2d 794 (1979).
It should first be noted that it is and has long been thoroughly settled that a common carrier has the right either at common law or by tariff regulation to open and search freight on suspicion of containing articles contrary to tariffs or constituting contraband or affecting safety and that the discovery in the course thereof of things implicating the shipper or receiver criminally is not subject to Fourth *509 Amendment attack because the inspection is by a private entity and not a governmental one. United States v. Ford, 525 F.2d 1308 (10 Cir.1975); United States v. Issod, 508 F.2d 990 (7 Cir.1974), cert. den. 421 U.S. 916, 95 S.Ct. 1578, 43 L.Ed.2d 788 (1975); United States v. Pryba, 163 U.S. App. D.C. 389, 502 F.2d 391 (1974), cert. den. 419 U.S. 1127, 95 S.Ct. 815, 42 L.Ed.2d 828 (1975).
In United States v. Davis, supra, a loaded revolver was found in defendant's briefcase during a routine search of the carry-on luggage of passengers boarding an aircraft. This search was held to be governmental activity for Fourth Amendment purposes because governmental concern over the increased incidence of aircraft hijacking had given rise to a strong federal affirmative preventive program  "a nationwide anti-hijacking program conceived, directed, and implemented by federal officials in cooperation with air carriers." 482 F.2d at 897. The routine search of carry-on luggage was not something the airline had done before the program was instituted or would have done on the occasion in question if not for the program. The case is obviously distinguishable from the situation of an inspection of air freight, as in the instant case, where as a matter of law and under the evidence here adduced airline carriers have, long before the current hijacking scare which began in the 1960s, exercised the right to inspect freight for legitimate common-carrier purposes.
As explained in testimony by Knudson, the airline supervisor at Los Angeles, even before adoption of the Air Transportation Security Act in 1974 "we have always had the right [based on NCAB guidelines] to open any bag that aroused suspicious nature * * * there were certain securities for the airline. We felt that for any reason there was something that would be a threat at any time we reserved the right to open that package." Security measures put into effect after 1975 were not "new" but merely represented more stringent enforcement than before. The attribution by the trial court to Knudson that in his entire experience prior to 1974 he knew of no instances "where the company had *510 ever opened a package" in circumstances like these is, we believe, an inadvertent reading of Knudson's testimony. The testimony in that regard related to "bags" checked by flight passengers "before they got on the plane." Knudson had never worked on air freight.
Even as to the practice concerning passenger baggage, Knudson's experience differed from that of Strand, the airline package clerk who handled the package here involved in Los Angeles. He testified he had "plenty of times" prior to the "hijacking" era opened luggage if it looked suspicious.
Of most present pertinence was Strand's testimony in relation to inspection of air freight parcels. The air bill made out at the time of a shipment is required to state the contents because the tariff prohibits hazardous articles such as flammables, corrosive materials, wet cell batteries, firearms or the like. Airline regulations determine what is hazardous, and they were in effect long prior to the recent accentuation of security measures. Strand stated he "has to know" what is going on the plane because of the tariff regulations. Screening passengers is mainly to seek out weapons; screening baggage and packages is mainly for detection of hazardous substances. The implication was clear that Strand's procedures in the instant case were dictated by long-standing procedures and guidelines related to prohibition of carriage of hazardous substances independent of security measures addressed to the hazard of hijacking.
The trial court's position was supported by the original opinions filed in Fannon, supra, but we are in square disagreement therewith and concur in the dissent therein subsequently reported at 569 F.2d 1106 (on a petition for rehearing of the original decision in which the dissenter had at first reluctantly concurred, 556 F.2d at 965-966), as well as in the overruling opinion of the court en banc in the Gumerlock decision, supra, discussed infra.
The Fannon case was similar to the present one in that the articles inspected on suspicion by an airline employee were packages being shipped as freight and were found to contain *511 heroin. The appellate court reversed a trial level holding that the search was a private one, not subject to Fourth Amendment strictures. It relied partly on United States v. Davis, supra, but primarily on the adoption by Congress in 1974 of the Air Transportation Security Act, P.L. 93-366, Title II, 88 Stat. 415, 49 U.S.C.A. 1511. The court cited the provisions of that statute (a) requiring the administration of the Federal Aviation Administration to authorize air carriers to condition air transportation of persons and property on the consent of the passenger or shipper to searches to determine the presence of dangerous weapons, explosives or other destructive substances; and (b) that any air transportation agreement should be deemed to include an agreement that carriage may be refused when consent to search for substances described in (a) above is refused. 556 F. 2d at 363-364. The court took these amendments to evince congressional policy to turn private air carriers into governmental instrumentalities to deter and prevent air piracy and violence such that all inspections of air freight by airlines thereafter became governmental action for Fourth Amendment purposes. Id. at 965.
The dissent by Judge Chambers in Fannon took the position that each airline inspection or search is to be considered on its own facts before a judgment can be made as to whether a case of private air-carrier or governmental action is presented. 569 F. 2d 1106-1107. He said:
"Moreover, I cannot accept the majority's leap from the enactment of this 1974 amendment to the conclusion that it supplants the preexisting right of carriers to search based on common law or tariff, Many searches are made for wholly private purposes, as the majority recognizes, e.g., to identify the shipper, to determine if the right tariff has been employed, to assure against pilferage. Such searches are now automatically labelled by the majority as affected with a "governmental" interest. And in fact they are not "governmental" at all. I find no virtue in proceeding by means of the fiction of a presumption of governmental interest, when we can and ought to be looking for the facts in each case. For instance, the court in Davis was considering search by an airplane employee who was stationed at or near the loading gate and within six feet of a customs *512 officer and within fifteen feet of several U.S. marshals. In this case, however, we are dealing with freight office clerks who, acting entirely on their own, and with no law enforcement officers nearby, decided to search when their suspicions were aroused by the consignor's appearance and mannerisms. They were looking for drugs, not explosives, when they opened the parcels. * * *" [Ibid.]
The position of the dissenter in Fannon was upheld by the Court in Gumerlock. Upon a careful and comprehensive analysis of the Air Transportation Security Act of 1974, of the "Anti-hijacking Act of 1974," enacted at the same time, and of various implementing administrative regulations subsequently adopted, the court concluded that the overall congressional purpose was to "prevent the seizure of aircraft, primarily by subjecting passengers and their carry-on possessions to a preboarding screening search to prevent the introduction of weapons and explosives into the cabin of aircraft." 590 F.2d at 796. There was no manifested concern with air freight. Id. at 797, 798. Said the court: "Moreover, there was no need to grant air carriers the right to refuse to transport freight unless the shipper consented to inspection  that right had been long and firmly established in carrier tariffs and by common law." Id. at 798.
On the facts of Gumerlock (and Fannon) the court found that the inspection and search there conducted by the airline staff was effected independent of any governmental scheme of air freight inspection but solely "pursuant to a tariff provision that [they] understand authorized inspection in such circumstances." Id. at 799. The convictions were affirmed.
In general accord with the rationale and result in Gumerlock is United States v. Freeland, 562 F.2d 383, 385 (6 Cir.1977), cert. den. 434 U.S. 957, 98 S.Ct. 484, 54 L.Ed.2d 315 (1977).
Gumerlock is directly apposite, and it constitutes persuasive authority for the Fourth Amendment immunity of the inspection and search procedures undertaken in the instant case. Here, too, the facts plainly require the conclusion that the airline employees were acting as agents of a private *513 entity, not the government. The search at Los Angeles was not governmental action subject to constitutional criteria.
Having discovered contraband in the package, it was the duty of the airline employees to turn it over to the police. This did not entail any search or seizure by the police, the invasion of defendants' privacy in their effects having already been consummated.
So much decided, we agree with the analysis of the trial court that no search subject to constitutional constraints occurred when the package was opened at Newark. "The controlled delivery of this package was a single episode. * * * The police exercised continuous control over the package from their examination of its contents in Los Angeles to their reexamination of its contents in New Jersey." 160 N.J. Super. at 582-583. See United States v. Ford, supra, 525 F.2d at 1310-12; United States v. DeBerry, 487 F.2d 448, 451 (2 Cir.1973). The only effective invasion of the privacy of the defendants in the package was by the airline, not by the police. It was only after such privacy was so breached, that the package and its contents were turned over to the police. The evidence should not have been suppressed.
Reversed.