**UNITED STATES of America, Plaintiff,**

v.

**John Allen ANDREWS, Defendant.**

**Crim. A. No. 79–CR–88.**

United States District Court, D. Colorado.

Aug. 9, 1979.

Carole C. Dominquin, Asst. U. S. Atty., Denver, Colo., for plaintiff.

Joseph Saint-Veltri, Denver, Colo., for defendant.

## ORDER

KANE, District Judge.

Defendant John Allen Andrews is charged in a single count indictment with possession of cocaine with the intent to distribute in violation of 21 U.S.C. § 841(a)(1). Defendant has filed a motion to suppress a package, allegedly containing cocaine, that was opened by a Continental Airlines employee after the package was deposited with the air carrier in Miami, Florida, for shipment to Denver, Colorado.

An evidentiary hearing was held on May 11, 1979, and the parties subsequently briefed the issue of whether this search was a private one, conducted by air carrier employees without government involvement, and, hence, not subject to the Fourth Amendment. The facts are not materially in dispute.

At approximately 2:30 p. m. on March 23, 1979, an unnamed male entered the Continental Airlines Cargo Service office in Miami, Florida, and asked the agent whether he could cash a $100 bill. When the agent responded affirmatively, the man went out to his car and brought back a package addressed to a Mr. John Andrews in Denver, Colorado. The man was handed an airbill to fill out. On the airbill the man indicated that the package contained an auto-bar dispenser. In addition, the label affixed to the package indicated the sender to be a company named Inter-American Auto Bar.

While the above transaction was taking place, another employee in the office noticed the custom-made Cadillac that the man was driving and, along with several other employees in the office went out to the parking area to inspect it. Upon their return, the exceptional nature of the car was related to Mr. Kerry Galegher, supervisor of the cargo service, Continental Airlines.

At that time, Galegher asked to see the airbill. He then requested the package, which he observed to be approximately 12½″ square and wrapped in brown paper. In his testimony, Galegher stated that brown paper is an uncommon way to ship cargo [that cargo is normally shipped in a regular cardboard box with the logo affixed thereto]; and that this factor, in addition to the $100 bill, aroused his suspicions.[1]

When questioned about what he suspected was in the package, Galegher testified that he wasn't sure, "anything that could be harmful, possibly an incendiary device or restricted article." He stated that "once we signed the airbill and the shipment's

1. Mr. Galegher stated several times in his testimony that his suspicions were not aroused by the custom-made Cadillac. However, given the reaction of his fellow employees, and his own reaction after being told of the automobile and the $100 bill, I find this assertion untenable.

tendered to us, it is our shipment to do with as we please." Concluding that the contents could possibly be harmful to Continental Airlines or the passengers or aircraft, Galegher opened the package.

When Galegher removed the tape from one end of the package in order to view the interior, he observed that the product was in some type of grocery box. Convinced that something other than an autobar dispenser was in the package, but not thinking that expert assistance should be obtained or safety measures taken, he opened the top of the box and discovered newspaper stuffing, three or four books, a Wilson tennis ball can full of dirt, and a plastic bag wrapped in cardboard. He stated that the plastic bag appeared to contain powdered sugar or some other white substance. He found no autobar dispenser.

Galegher then notified the narcotics unit at the Miami International Airport that he had something he thought could be narcotics. He waited approximately 30 to 45 minutes in his office with the package until agent Joe Iuculano and another agent arrived. These agents, who are employed by the Dade County Public Safety Department, Sheriff's Division, tested the substance and concluded that it was cocaine. The agents took a sample from the plastic bag and notified Drug Enforcement Administration agents in Denver of the seizure. Both agents initialed the bag that contained the cocaine.

The package was then boxed up by Galegher in the same manner that it had been received and was transported to the aircraft. The airplane left Miami at approximately 5:45 p. m. on March 23, 1979 and arrived in Denver at approximately 9:10 p. m. that same evening.

James Roth, an agent with the Drug Enforcement Administration, testified that he removed the package from flight 405 that evening but did not open it. He initialed the package and put it into the high value vault at Continental jet freight. Roth testified that he removed the package from the vault at approximately 7:45 a. m. the following morning and kept it until 11:20 a.

m., when one of the Continental clerks advised him that someone was at the counter attempting to claim it.

Roth walked to the counter dressed as a Continental Airlines clerk and called out the name of John Andrews. When defendant Andrews identified himself, Roth said that he wanted to speak with him out in the hallway near the counter for a few minutes. Roth did not identify himself as a law enforcement officer.

When they were alone in the hallway, Roth told Andrews that the package had arrived in a partially opened condition and that in the proce of resealing the package he discovered that it did not contain machine parts. Roth told Andrews that it looked like drugs in the box and that, unless Andrews made it worth his while, he would report it to the police. Andrews went out to his car to get a checkbook.

As Andrews left the building, Roth made a radio transmission to the surveillance agents that the individual by the MG in front was the person attempting to claim the package. When Andrews came back, Andrews and Roth went down the hall to a restroom where Andrews wrote Roth a check for $50. Andrews indicated to Roth that in a day or two there would be enough money in the account to cover the check. Roth accepted the check and told Andrews that if he came over to the counter the package would be released to him. Andrews accepted the package as his, signed the airbill, and walked out of the building.

Roth advised surveillance agents that Andrews had picked up the package and directed them to arrest Andrews before he could leave the parking area. Roth then joined the other agents in placing Andrews under arrest, intercepting the package, and transporting it to the Drug Enforcement Administration office.

## MOTION TO SUPPRESS

Andrews argues that the federal government effectively placed its imprimatur on airfreight procedures when Congress enacted the "Air Transportation Security Act of

"1974." 49 U.S.C. § 1511. He asserts that federal statutes and regulations require the airfreight shipper to be notified that there is a right to refuse consent to search; that the shipper herein was never notified or advised of such a right; and that the warrantless search of the package deposited with Continental Airlines violated the fourth amendment prohibition against unreasonable searches.

Title 49, United States Code, Section 1511 provides in pertinent part:

(a) The Administrator shall, by regulation, require any air carrier, intrastate air carrier, or foreign air carrier to refuse to transport—

.　　.　　.　　.　　.

(2) any property of any person who does not consent to a search or inspection of such property to determine whether it unlawfully contains a dangerous weapon, explosive, or other destructive substance. Subject to reasonable rules and regulations prescribed by the Administrator, any such carrier may also refuse transportation of a passenger or property when, in the opinion of the carrier, such transportation would or might be inimical to safety of flight.

(b) Any agreement for the carriage of persons or property in air transportation or intrastate air transportation by an air carrier, intrastate air carrier, or foreign air carrier for compensation or hire shall be deemed to include an agreement that such carriage shall be refused when consent to search such persons or inspect such property for the purposes enumerated in subsection (a) of this section is not given.

The Federal Aviation Administration has promulgated regulations whereby particular air carriers are designated "certificate holders." Pursuant to 14 C.F.R. § 121.-538(b), certificate holders are required to adopt and put into use a screening system, acceptable to the Administrator, that is designed to prevent or deter the carriage aboard its air craft of any explosive or incendiary device or weapon in carry-on baggage or on or about the persons of passengers, except as provided in § 121.585, and the carriage of any explosive or incendiary device in checked baggage. Each certificate holder shall adopt and put into use its security program prescribed in paragraph (c) of this section.

(c) Each certificate holder shall prepare in writing and submit for approval by the Administrator its security program including the screening system prescribed by paragraph (b) of this section, and showing the procedures, facilities, or a combination thereof, that it uses or intends to use to support that program and that are designed to—

.　　.　　.　　.　　.

(3) Prevent cargo and checked baggage from being loaded aboard its aircraft unless handled in accordance with the certificate holder's security procedures; . .

This security program must be submitted to the Administrator for his or her approval. 14 C.F.R. § 121.538(d). However, the security program of any certificate holder which is adopted by the carrier and approved by the administrator is not made available for public inspection or copying. 14 C.F.R. § 191.3.

In July, 1976, the administrator promulgated subsection (k) to 14 C.F.R. § 121.538. That subsection, which defendant argues applies to airfreight since it "provides for the refusal to transport if consent to search airfreight is refused by the shipper,"[2] states as follows:

(k) Each certificate holder shall refuse to transport—

(1) Any person who does not consent to a search of his person in accordance with the screening system prescribed by paragraph (b) of this section; and

**2.** Defendant's *Memorandum Brief in Support of Motion to Suppress Evidence* at P. 2. (Filed May 21, 1979.)

(2) Any property of any person who does not consent to a search or inspection of that property in accordance with the screening system prescribed by paragraph (b) of this section.

Andrews argues that because the airfreight shipper was not notified that he had a right to refuse consent to search the airfreight in question, this warrantless search violated the fourth amendment prohibition against unreasonable searches. Andrews urges that this statute, 49 U.S.C. § 1511, along with its concomitant regulation, 14 C.F.R. § 121.538, confers on the airfreight carrier a governmental function sufficient to subject its conduct to constitutional limitations.

This contention was initially addressed by the Ninth Circuit in *United States v. Fannon,* 556 F.2d 961 (9th Cir. 1977). There the court concluded that

Congress intended to employ the efforts of private air carriers in insuring the security of air transportation from seizure, bombings and like forms of criminal violence. In so delegating the conditional and circumscribed power of search embodied in section 1511(b), Congress has conferred on air carriers a governmental function subject to constitutional limitations. *Id.* at 965.

On rehearing, the Ninth Circuit, sitting *en banc,* reversed itself in *United States v. Gumerlock,* 590 F.2d 794 (9th Cir. 1979). In *Gumerlock,* the Ninth Circuit concluded:

But whatever Congress may have intended to accomplish by subsection (b) of section 204, the Federal Aviation Administration has not included "airfreight shipments within the reach of an administrative scheme designed to enhance the security of air transportation from acts of criminal violence," . . . much the less within the reach of an administrative scheme that involves opening and inspecting the contents of airfreight shipments. *Id.* at 798.

*See United States v. Edwards,* 443 F.Supp. 192 (D.Mass.1977).

■ The court, in *Gumerlock, supra,* also determined that subsection (k) to 14

C.F.R. § 121.538 does not apply to airfreight. Specifically, the court reasoned:

By the express terms of the new regulation, the carrier's obligation not to carry persons or property applies when consent is refused to search in accordance with the screening system prescribed in subparagraph (b) of section 121.538. And as we have seen, the system mandated by section 121.538(b) is expressly confined to passengers, their possessions, and, at the time the amendment was adopted, to checked luggage. *It does not apply to airfreight. Id.* at 798–99 (Emphasis added.)

Hence, Andrews' argument that the air carrier's failure to secure the shipper's consent prior to searching the airfreight in question violated his fourth amendment protection from unreasonable searches and seizures is unavailing. Since Continental Airlines was under no statutory compulsion to search the package deposited with it in this case, the requisite governmental participation necessary to invoke constitutional protection is missing.

■ Defendant also argues that since he does not have access to the Continental Airlines security program, [which was adopted and submitted to the administrator for approval pursuant to 14 C.F.R. § 121.-538(c)] he cannot determine whether the search of the "cargo" in question was conducted in accordance with the certificate holder's security procedures which have been approved by the government. This argument is similarly without merit.

Although the regulation [14 C.F.R. § 121.-538(c)] mentions "cargo," there is nothing in the provision which requires carriers to adopt security procedures with respect to cargo. At the request of Andrews, I viewed *in camera* the security program of Continental Airlines which has been adopted by that airlines and approved by the administrator. There is nothing in that security program addressing procedures to be followed in handling cargo.

■ The burden is on the defendant to establish government involvement in a chal-

lenged search. *United States v. Freeland,* 562 F.2d 383 (6th Cir. 1977), *cert. denied,* 434 U.S. 957, 98 S.Ct. 484, 54 L.Ed.2d 315. As already indicated, the statutes, rules, and regulations upon which defendant Andrews relies do not support the requisite government involvement necessary to subject this search to constitutional limitations. Since this issue was not raised by the motion I expressly do not reach the question of whether the search of Andrews in Denver meets constitutional muster.

■ It is now necessary to determine whether Galegher, as supervisor of the cargo service of Continental Airlines, opened the package herein pursuant to any other governmental compulsion, direct or otherwise. Galegher testified that he did not receive any instructions from the sheriff's department or DEA officials in Miami to open packages systematically; and that, in fact, there existed no policy or understanding with the DEA or the sheriff's department concerning the opening of packages. Galegher claims that he opened the package on his own accord because he suspected that the contents could possibly be harmful to Continental Airlines or the passengers or aircraft.

The circumstances surrounding the airfreight inspection conducted by Galegher on March 23, 1979, do not evince the desire to vindicate any private interest of Continental Airlines. In fact, it is this court's conclusion that Galegher's actions were prompted solely by his desire to assist law enforcement in uncovering, what he perceived to be, the attempted distribution of contraband. Any expressed concern for the safety of passengers and aircraft in this case is inconsistent with the manner in which the package was cared for once Galegher accepted possession of it to the extent that the proffered reason must be considered an afterthought. However, there is no specific evidence to support a finding that Galegher conducted this search at the behest, control, or direction of the government. As the Ninth Circuit, in *Gumerlock, supra,* stated:

Assuming the searches were undertaken in whole or in part to find narcotics, the airline employees acted officiously and not at the behest of the government. A private search in which the government is in no respect involved—either directly as a participant or indirectly as an encourager—is not subject to the Fourth Amendment because the private actor is motivated in whole or in part by a unilateral desire to aid in the enforcement of the law. 590 F.2d at 800.

■ It is not up to the courts to enact law. It is up to Congress. Congress chose to enact legislation regulating specific aspects of air transportation. It is only upon those aspects that the government may be deemed to have placed it imprimatur. I find that airfreight such as that subject to the search in question was not included in the governmental directives enumerated in the "Air Transportation Security Act of 1974." *See United States v. Gumerlock, supra; United States v. Edwards, supra.* The reasons for excluding airfreight, whether intentional or otherwise, are neither clear nor discernible. The practical result, however, is that self-appointed policemen or vigilantes demonstrate conduct which is protected from constitutional scrutiny. It encourages the type of behavior by private individuals that would not be tolerated if performed by government officials. Thus, privacy and the exercise of property rights by all persons are subject to invasion by private individuals who are neither trained to minimize such invasions nor subject to discipline for the perpetration of conduct which fails to meet constitutional standards. I recognize that the current fashion in legal analysis suggests that this result is acceptable even though a contrary view would be decidedly more prudent and responsible.

Furthermore, given the pervasive influence of the government, as evidenced by its "secret" programs, such as here present, it will always be difficult, if not impossible, for a defendant to prove that the government "encouraged" what otherwise appears to be a private search.

**462**

This is not the appropriate case in which to consider the philosophical underpinnings, if any, of the exclusionary rule, but the "chancellor's foot veto" which was viewed with such great alarm in *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973) seems presently to be inextricably stuck in the Serbonian bog of searches and seizures. As the Ninth Circuit so ably demonstrated in *Fannon* and *Gummerlock, supra,* this case could have gone either way. I must admit to a feeling of considerable foolishness in each effort to determine whether a constitutionally protected zone of privacy exists in a briefcase or a cigarette package or a cardboard box. I am tempted to pray that when I awake there will be no exclusionary rule. I am, however, bound by my best perception of what the law presently is rather than what it may become.

IT IS ORDERED that the defendant's motion to suppress is denied.