**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**John Allen ANDREWS,**
**Defendant-Appellee.**

No. 79–1963.

United States Court of Appeals,
Tenth Circuit.

Argued Jan. 24, 1980.
Decided March 19, 1980.

Mervyn Hamburg, Atty., Dept. of Justice, Washington, D.C. (Joseph F. Dolan, U. S. Atty., Denver, Colo., with him on the brief), for plaintiff-appellant.

Joseph Saint-Veltri, Denver, Colo., for defendant-appellee.

Before BARRETT, DOYLE and SEYMOUR, Circuit Judges.

BARRETT, Circuit Judge.

The United States (Government) appeals from a final order of the District Court denying a Motion for Reconsideration after the Court granted appellee John Allen Andrews' (Andrews) Second Motion to Suppress Evidence. Jurisdiction is conferred pursuant to 28 U.S.C. § 1291.

An indictment was lodged against Andrews on April 12, 1979, charging him with possession of cocaine with intent to distribute the same, in violation of 21 U.S.C. § 841(a)(1). Andrews filed a Motion to Suppress the cocaine as evidence, contending that it was discovered as a result of an unauthorized search of a package by an airline employee in Miami, Florida. After

this motion was denied, Andrews filed a Second Motion to Suppress which was granted.

## Factual Background

On the afternoon of March 23, 1979, an unidentified man presented a package to the Continental Airlines Cargo Service office at the Miami, Florida, International Airport for shipment to Denver, Colorado. Writing on the wrapping paper covering the package identified the sender as "Inter-American Autobar Systems" and the intended recipient as Andrews, whose address was in Denver, Colorado. The writing described the contents of the package as "dispenser housing". The Continental Airlines Cargo Service Supervisor, Kerry Galegher, testified that he became suspicious about the package because goods sent by corporations ordinarily were packaged in cardboard boxes bearing the corporation's trade name or logo, and were not simply wrapped in brown paper. Based on his suspicion, Galegher opened the package. Inside he found a plastic bag containing a white powder. Galegher notified the Dade County, Florida, police authorities of his discovery of the white powder. Soon thereafter, two Dade County detectives assigned to the Miami Airport Narcotics Unit arrived at the Continental Cargo Service station, where they field tested the white powder. They concluded that it contained cocaine. Thereupon the detectives phoned Agent James Roth of the federal Drug Enforcement Administration (DEA) office in Denver, notified him of the discovery and provided a description of the package delivered for shipment to Andrews in Denver. After consulting with Agent Roth, the detectives removed some of the cocaine from the plastic bag. The package was then re-wrapped for shipment and flown to Denver on a Continental flight, which arrived at 9:10 p. m. March 23, 1979.

When the package arrived in Denver, Agent Roth took custody of it. He placed it in a vault at Continental's freight office at the Denver airport. The following morning, Roth took the package from the vault and while dressed in the uniform of a Continental Airlines clerk at Continental's freight office, he met Andrews at about 11:15 a. m. After Andrews identified himself, Agent Roth asked Andrews to meet him in the hallway, where Roth told Andrews that he had been on duty the following evening when the package arrived in a partially opened condition, and that while resealing it, he discovered that the package did not contain any machine parts, even though they were listed on the air freight bill. Roth inquired of Andrews whether he was aware of the mislabeling. Andrews responded affirmatively. Roth then remarked that the package appeared to contain drugs which should be reported to the police unless Andrews was prepared to make it worth Roth's while not to make such a report. Thereupon Andrews asked Roth how much he wanted. Roth stated that $50.00 was reasonable. Andrews then went to his vehicle to get his checkbook. Upon his return, Andrews wrote Roth a check in the amount of $50.00. Agent Roth inquired whether the check was good. Andrews replied that while he might not have sufficient funds in his account then, if Roth waited a day or two there would be plenty of money to cover the check. Roth took the check and then released the package to Andrews, who left the building. As Andrews walked toward his car, he was arrested by DEA agents who had been in radio communication with Roth. After Andrews' arrest, Roth resumed physical custody of the package. Roth opened it and removed the cocaine at the DEA office in Denver.

## First Motion to Suppress

Evidence was adduced at the hearing on Andrews' first of two Motions to Suppress, directed at the alleged illegal search and seizure at the Miami airport. Memorandum briefs were filed.

Andrews recognized that this Court's opinion in *United States v. Ford*, 525 F.2d 1308, 1309 (10th Cir. 1975) held that a search by airport employees of the contents of an air freight package and its subsequent search and seizure by law enforcement offi-

cers called in by airline officials constitutes a private search beyond the protection of the Fourth Amendment. Even so, Andrews contended that *Ford* did not involve the prohibitions contained in the 1976 addition of Subsection (k) to 14 C.F.R. § 121.538. Subsection (k) provides that an airline may refuse to transport goods if consent to search the goods is refused by the shipper. Andrews argued that *Ford* did not control inasmuch as it predated the addition of Subsection (k). Andrews further argued that in light of the addition of Subsection (k), the Government placed its imprimatur on air freight procedures, thus implanting searches conducted by airline personnel within the Fourth Amendment; and that because federal statutes and regulations require the airline to notify an air freight shipper that he has a right to refuse consent to a search of its goods, the airline's failure to advise the Miami shipper in this case eliminates any consideration of consent and renders the subsequent warrantless search violative of the Fourth Amendment.

Accordingly, argued Andrews, the exclusionary rule should be applied and the "fruit" of the Miami airport search conducted by Continental Airlines personnel (the cocaine) must be suppressed as evidence from use at trial because it was plucked from "the poisonous tree". Andrews placed substantial reliance on this Court's opinion in *United States v. Gooch*, 603 F.2d 122 (10th Cir. 1979). We there held that even though the warrantless search of an aircraft used in illegal transportation of marijuana from Mexico to the United States was justified on the basis of the existence of probable cause and exigent circumstances, the same rationale did not apply to a briefcase found on board the plane by the United States Customs officers which was searched by them without the benefit of a search warrant. The striking factual difference between *Gooch* and the case at bar is that in *Gooch*, unlike the instant case, police officers conducted the warrantless search. Further, *Gooch* involved the search of a private briefcase aboard a noncommercial aircraft, whereas the instant case involves the search of an ostensibly corporate package to be shipped on a commercial flight. In *Gooch* we stated that *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) recognized that a much greater expectation of right of privacy exists in relation to the contents of a briefcase—since it is an item of personal luggage—than the contents of a commercial cargo package.

In its Order of August 9, 1979, denying Andrews' First Motion to Suppress, the District Court rejected Andrews' argument that the federal government effectively placed its imprimatur on air freight procedures by enactment of the Air Transportation Act of 1974, 49 U.S.C. § 1511, and the Federal Aviation Administration regulations governing air carriers and security measures for cargo shipments. *See*: 14 C.F.R. § 121.538(b), (d) and (k).

The District Court rejected the holding in *United States v. Fannon*, 556 F.2d 961 (9th Cir. 1977), strongly urged upon it by Andrews. *Fannon* held that the aforesaid statute and regulations meant that Congress intended to subject air freight shipments such as packages containing heroin "to the government's administrative scheme to strengthen the security of air transportation" thus rendering airline personnel searches conducted pursuant to the program subject to the Fourth Amendment. *Fannon*, however, was overruled in *United States v. Gumerlock*, 590 F.2d 794 (9th Cir. 1979) (en banc), *cert. denied*, 441 U.S. 948, 99 S.Ct. 2173, 60 L.Ed.2d 1052 (1979). The Ninth Circuit there held that air freight shipments are not subject to the security screening process mandated by the Government for passengers and their carry-on possessions, and further that the search of freight packages by airline personnel constitutes a private search in which the Government is in no respect involved, either directly as a participant or indirectly as an encourager. Accordingly, the Ninth Circuit held that an airline conducting such a private search is not subject to the Fourth Amendment.

■ The District Court rejected the *Fannon* rationale on the basis that "[s]ince Continental Airlines was under no statutory compulsion to search the package deposited with it in this case, the requisite governmental participation necessary to invoke constitutional protection is missing." [R., Vol. I, p. 49]. We agree. Even so, the District Court opined that the activities pursued by Supervisor Galegher in opening the package, were ". . . prompted solely by his desire to assist law enforcement in uncovering, what he perceived to be, the attempted distribution of contraband . . . [even though] there is no specific evidence to support a finding that Galegher conducted this search at the behest, control, or direction of the government . . . [and even though] I find that air freight such as that subject to the search in question was not included in the governmental directives enumerated in the "Air Transportation Security Act of 1974". . . The practical result . . . is that self-appointed policemen or vigilantes demonstrate conduct which is protected from constitutional scrutiny. It encourages the type of behavior by private individuals that would not be tolerated if performed by government officials. Thus, privacy and the exercise of property rights by all persons are subject to invasion by private individuals who are neither trained to minimize such invasions nor subject to discipline for the perpetration of conduct which fails to meet constitutional standards." [R., Vol. I, pp. 51, 52].

■ Predicated on that which the District Court determined to be "what the law presently is rather than what it may become" the First Motion to Dismiss was denied. Andrews recognizes that the District Court correctly interpreted and applied the present state of the law in this Circuit to the issue involved in the First Motion to Dismiss. Following the District Court's August 9, 1979 ruling on the motion, this Court, in *United States v. Gibbons*, 607 F.2d 1320, (10th Cir. 1979) re-affirmed its holding in *United States v. Ford, supra.* Thus, the law in this Circuit is that airline freight inspections by suspicious airline officials

who are properly proceeding under tariff regulations and who are not acting "in collusion with federal officials" are private searches. Accordingly, the cocaine seized by the Dade County detectives in Miami was admissible in evidence under the Fourth Amendment.

Unlike the District Court, we are not inclined to do other than commend those airline employees who undertake reasonable means to find narcotics involved in air freight shipments motivated by a desire to aid in the enforcement of the law under circumstances in which the Government is neither a direct participant or an indirect encourager.

*The Second Motion to Suppress*

Andrews' Second Motion to Suppress was filed July 18, 1979. It is the Order granting this motion which is the subject of this appeal.

The Second Motion to Suppress pertains to the contraband contents of the package taken from Andrews following his arrest upon his departure from the Continental Air Freight office in Denver, inasmuch as that warrantless search was conducted by DEA agents. Andrews, again, relies upon *United States v. Gooch, supra.*

The District Court granted the Second Motion to Suppress without the benefit of a written memorandum. However, the District Court orally stated its reasons for granting the Motion following arguments of counsel, as follows:

THE COURT: To me the case was clearly controlled by *Sanders against Arkansas*. The Motion—the second Motion to Suppress, the contents of the boxes granted, there is just nothing in the record to establish exigent circumstances. There is plenty to establish probable cause, but that's the teaching of *Sanders against Arkansas*, you've got to have both. It's always been the law, but the Court has made clear that you have to— in that case luggage—and I see no difference here between the air freight that the Government was delivering over to

Andrews through the agent, who was at the time Agent Roth, at the time posing as a Continental Airlines employee. The air cargo and the air luggage don't make a meaningful distinction to me at this point. It would with respect to the question of whether the Continental Airlines person in Miami was acting under Governmental authority. But here we've got the Governmental authority in the search and seizure that was made after the arrest of Mr. Andrews.

I would say this, that I have not been hesitant to criticize the D.E.A. when I thought it was deserving of it. In this case I feel sorry for them, because I think I would have done exactly the same thing they did in this case. And we have also a retroactive application of the law. But that is what *Gooch* is also about. The Tenth Circuit applied Sanders retroactively. And you can't have it both ways. You can't have possession on a string, and take it back and say it was in the possession of the Government all the time. They effectively seized it at the Continental Airlines place in Stapleton Airport.

[R., Vol. IV, pp. 16–17].

### The Issue on Appeal

The issue on appeal, posited by the Government, is whether a DEA agent at the termination point of a controlled delivery was required to secure a search warrant before re-opening a package that had been lawfully opened and found to contain cocaine prior to the controlled delivery.

The District Court's order granting Andrews' Second Motion to Suppress was predicated on its view that the re-opening of the package taken from the person of Andrews by DEA Agent Roth violated the dictates of *Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979). *Sanders* followed the dictates of *United States v. Chadwick, supra.*

In our view *Arkansas v. Sanders, supra, United States v. Chadwick, supra, United States v. Gooch, supra,* and many other cases involving the validity of warrantless "suitcase" searches do not apply to the facts and circumstances of the instant case. None of those cases involved, as here, initial private searches beyond the commands of the Fourth Amendment. On the contrary, in each of those cases police authorities were, at all times, *solely* involved. Thus, in each, because of the direct and sole involvement of Government officials, it was held that the warrantless arrests were valid based upon the existence of probable cause, but the warrantless searches of personal luggage found in the possession of the person or persons arrested were violative of the warrant commands of the Fourth Amendment. Each of those opinions concluded that there were no exigent circumstances preventing the Government officers from obtaining search warrants before conducting the searches. Thus, those opinions were anchored firmly to the proposition that because the police officers were solely and completely in control and dominion of the actors and the suitcases and/or packages, there were no exigent circumstances preventing them from undertaking the steps required to secure search warrants before proceeding with the searches.

Andrews submitted for our consideration, *United States v. Gibbons, supra.* Andrews is not, of course, in "sympathy" with its holding. However, he attempts to distinguish *Gibbons* and *Ford* from the case at bar on the basis that those decisions involved only a *single search,* whereas the instant case involves *two separate police seizures.*

Andrews argues that even should the initial "search" at the Continental cargo office in Miami be treated as beyond the reach of the Fourth Amendment, still the Denver seizure and search was, as found by the District Court, direct Government action implicating the strictures of the Fourth Amendment. Andrews places heavy emphasis on the fact that he possessed a reasonable expectation of privacy relative to the contents of the package after it was delivered into his possession in Denver, Colorado. He relies on *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

*Rakas* involved the admissibility of shells found in the glove compartment and a sawed-off rifle found under the front seat of a getaway car following an armed robbery report. The petitioners were passengers in the car. They contended that, as passengers, they were "legitimately on the premises" [of the car] and thus had a legitimate expectation of privacy from admission in evidence at their trial of the shells and rifle. This Fourth Amendment contention was rejected. *Rakas* does not justify the claim of a "legitimate expectation of privacy" in the case at bar. There could be no such expectation following the initial lawful opening and search in Miami and the subsequent claim of the package in Denver by Andrews after he had been informed by Agent Roth that it contained drugs. Andrews contends that it is the fact of his possession of the package in Denver prior to its warrantless seizure and search that gave rise to his reasonable expectation of privacy requiring Fourth Amendment protection. We disagree.

In the case at bar, unlike *Sanders* and its progeny, the package when initially opened in Miami by Continental Airlines employees was unquestionably beyond the reach of the Fourth Amendment and the exclusionary rule. This Court has consistently held that searches by private individuals undertaken without "collusion with federal officers", [*United States v. Harding*, 475 F.2d 480 (10th Cir. 1973)], or "at the behest of Government officials", [*United States v. Gibbons, supra*, p. 1324], do not implicate the Fourth Amendment inasmuch as no Governmental action is involved. *See also: United States v. Ford, supra.* Decisions from other courts have held likewise: *United States v. Rodriguez*, 596 F.2d 169 (6th Cir. 1979); *United States v. Gumerlock, supra; United States v. Lamar*, 545 F.2d 488 (5th Cir. 1977), *cert. denied*, 430 U.S. 959, 97 S.Ct. 1609, 51 L.Ed.2d 810 (1977); *United States v. Issod*, 508 F.2d 990 (7th Cir. 1975), *cert. denied*, 421 U.S. 916, 95 S.Ct. 1578, 43 L.Ed.2d 783 (1975); *United States v. DeBerry*, 487 F.2d 448 (2nd Cir. 1973).

The contention that Andrews had a reasonable expectation of privacy in the package once it was delivered into his actual possession in Denver, necessitating the warrant requirement of the Fourth Amendment prior to its re-opening by the DEA agents and the subsequent search of its contents, is without merit. It is difficult to envision any "reasonable expectation of privacy" existing on Andrews' part after Agent Roth had informed him that he knew the package contained drugs. Notwithstanding, Andrews claimed and took physical possession of the package.

■ We recognize that the protections of the Fourth Amendment can be violated by guile as well as by force. *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *United States v. Oakes*, 564 F.2d 384 (10th Cir. 1977), *cert. denied*, 435 U.S. 926, 98 S.Ct. 1493, 55 L.Ed.2d 521 (1978). Whatever intrusion on the "right of privacy" was implicated here cannot trigger the Fourth Amendment simply because no Government action was taken in violation of the Fourth Amendment's commands. The central focus in any Fourth Amendment challenge is the standard of "reasonableness". Thus, just as the police good faith inventory of personal property found in an impounded automobile was classified as a "reasonable police" intrusion in *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), so, too, the intentional misrepresentation by an undercover federal narcotics agent as "Jimmy the Pollock" dealing in the purchase of marijuana at a discounted price which led to an invitation into petitioner's home where the agent purchased marijuana, was held not to violate the Fourth Amendment's "reasonableness" standard. *Lewis v. United States*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966). The *Lewis* opinion rejected the contention that, in the absence of a warrant, any official intrusion into the privacy of a home by "invitation" induced by fraud and deception constitutes a violation of the Fourth Amendment. The Court specially recognized the vitality of this language from *Sorrells v. United States*, 287 U.S. 435, 441–442, 53 S.Ct. 210, 212–213, 77 L.Ed. 413 (1932): "Artifice and stratagem may be

employed to catch those engaged in criminal enterprises. . . . The appropriate object of this permitted activity, frequently essential to the enforcement of the law, is to reveal the criminal design; to expose the illicit traffic, the prohibited publication, the fraudulent use of the mails, the illegal conspiracy, or other offenses, and thus to disclose the would-be violators of the law." (385 U.S. at p. 209, n. 5, 87 S.Ct. at 426.)

The "reasonableness" of the warrantless search and seizure in the case at bar is supported, and in our view, quite directly determined, by *United States v. Ford, supra.* That case involved facts very similar to those presented in the case at bar. In *Ford,* a package was delivered to an American Airlines freight agent in San Francisco, wrapped in brown paper, and addressed to a Miss Linda Ford in Oklahoma City, Oklahoma. It was opened by the airline agent when the woman who delivered it nervously responded that she did not know its contents and otherwise gave the airline agent cause for inquiry. The package, when opened by the airline agent, was found to contain a powdery substance. Local police were called in. The police conducted an on-the-spot field test which showed that the powdery substance was heroin. The police resealed the package which was then shipped on a flight to Oklahoma City, where law enforcement officers had been alerted. When the package arrived in Oklahoma City, Linda Ford's mother, Kathryn, appellant in the case, claimed it at the airline office. She proceeded, under surveillance, with the package to a waiting car. After entering the car with the package, she threw it out a window when she observed police officers approaching. The officers arrested Ford, retrieved the package and secured its contents. The trial court overruled a motion to suppress the contents of the package from admission in evidence. This Court affirmed and pertinently observed:

Next we consider the validity of the search, arrest, and seizure process in San Francisco and Oklahoma City. *It seems to us that the events which occurred in California and Oklahoma were one episode and must be considered together for Fourth Amendment purposes. Illegality in either place would be fatal to the government's case.* . . . Since *Boyd* [*Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746] and *Weeks* [*Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652], numerous cases have construed the phrase "unreasonable searches and seizures" with little consistency. . . . Mr. Justice White put it well in a dissenting opinion when he observed: "It is clear that effects may not be seized without probable cause but the law as to when a warrant is required to validate the seizure is confused and confusing." . . . [Here] *[w]e, thus have an inspection which was private in both motivation and manner. The government agents appeared only after the suspicion of the possible presence of contraband was confirmed by [the] discovery of the prophylactics. At this point, it was the province and indeed the duty of the officers to further investigate the open box, which they did without any invasion of protected rights of privacy* . . .

Having determined that no constitutional rights of Mrs. Ford were violated in the search, we proceed with an analysis of the seizure. *Appellant Ford apparently contends that the seizure occurred in Oklahoma City, separate and distinct from the search in California, and that since there was time to obtain a warrant before the Oklahoma City seizure, the warrantless seizure violated the Fourth Amendment.* . . . *We think this analysis misapprehends the facts and realities of the situation.*

*Realistically, the contraband was seized by the officers in California before it was ever shipped to Oklahoma. See United States v. DeBerry, 487 F.2d 448 (2nd Cir. 1973). The California officers marked the package and placed a business card inside it. Upon receiving assurances of cooperation from Oklahoma City officers, they authorized its shipment. This action constituted the initial act of control and dominion over the contraband, for with-*

*out government authorization the airline officials could not have shipped the contraband. This official dominion continued unbroken because close surveillance followed the seized contraband, insuring that it remain within official possession. Actual physical control was in fact reasserted by the Oklahoma City police when the arrest process was completed. . .*
[Thus] . . . *the official seizure of the contraband occurred in San Francisco when the government asserted dominion over it. The seizure must be judged against the Fourth Amendment as of that time and place . . .*
*The [California] search was private, and the ensuing warrantless seizure [California] was made upon probable cause under exigent circumstances.* [Emphasis supplied].

525 F.2d at pp. 1310–1313.

■ We hold that *Ford* fully applies to the case at bar. Here, as in *Ford*, the search conducted in Miami was private. When the Government officials were called in by Continental Airlines officials while the package was yet in Miami, the police seizure there was made upon probable cause and under exigent circumstances. Thus, the shipment of the package to Denver, its delivery over to Andrews there, and its subsequent taking from Andrews were, just as in *Ford*, actions constituting " . . . official dominion continued unbroken because close surveillance followed the seized contraband, insuring that it remain within official possession." 525 F.2d at p. 1313. *See also: United States v. Sanders*, 592 F.2d 788 (5th Cir. 1979) (U.S.App. Pndg.); *United States v. Issod, supra; United States v. DeBerry, supra; United States v. Ogden*, 485 F.2d 536, 537 (9th Cir. 1973).

REVERSED AND REMANDED for further proceedings.

SEYMOUR, Circuit Judge, dissenting:

The majority holds that there is no search or seizure at the termination point of a "controlled delivery" and, therefore, a search warrant is not required. Because the majority's "single search" analysis ef-

fectively insulates Fourth Amendment violations from challenge by Andrews, I must respectfully dissent.

The majority relies on our decision in *United States v. Ford*, 525 F.2d 1308 (10th Cir. 1975), where we reviewed a similar governmental seizure of narcotics after airline officials had discovered the contraband. In holding that there was no separate search or seizure at the place the heroin was delivered, this court stated that "official dominion continued unbroken because close surveillance followed the seized contraband, insuring that it remain within official possession." *Id.* at 1313; and *see United States v. Gibbons*, 607 F.2d 1320, 1325 n. 8 (10th Cir. 1979). While recognizing that *Ford* cannot be overturned except by an en banc decision of this court, I cannot agree with its reasoning or result.

The proper inquiry is whether the government conducted a new or different search at the point of delivery of the package. The conclusion in *Ford* that there is no second search is based on the assumption that the contraband remained in "official possession" until the arrest was completed. However, Andrews is charged with *possession* of cocaine with intent to distribute. It was only at the point of delivery in Denver that Andrews was capable of committing the crime with which he is charged. The government may not claim that it had sufficient dominion over the cocaine to obviate consideration of Andrews' Fourth Amendment rights while at the same time it is prosecuting him for a crime in which possession of the seized evidence is itself an essential element. "Proper administration of criminal justice should not include such contradictory assertions of governmental power." *United States v. Kelly*, 529 F.2d 1365, 1370–1371 (8th Cir. 1976). Because Andrews could not be charged with the crime until he was arrested with the package in Denver, the police activity there must be viewed as separate and apart from the original seizure in Miami.

Moreover, regardless of the nature of the crime, the *Ford* analysis results in complete denial of Fourth Amendment protection to

an addressee of a package where the contents of that package have been previously discovered at the point of shipment. As the district court below reluctantly recognized, and the majority here applauds, the Fourth Amendment is inapplicable at the point of shipment where the shipper opens the package and turns the contents over to the government, because the search was conducted by a private party. Nevertheless, I do not believe a lawful private search should always insulate subsequent police action, regardless of the circumstances, from the constitutional guarantees afforded by the Fourth Amendment. Furthermore, even had the search at the point of shipment been purely governmental, the case of *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), which was decided after *Ford*, makes it extremely doubtful that an addressee of a package has a sufficiently legitimate expectation of privacy *at the point of shipment* to raise Fourth Amendment questions concerning a search made at that time.

Under the *Ford* analysis, although the addressee's rights have ripened at the point of delivery, there is no search or seizure to be challenged. Thus, the addressee has no point at which he may assert a violation of his Fourth Amendment rights. It is my opinion that both the majority's result and reasoning unconstitutionally impinge on Andrews' rights. I would hold that the search by different police in a different state at a different time constituted a new search. The majority's conclusion, based on *Ford*, carves an exception to the Fourth Amendment where no exception is warranted.

Turning to the validity of the "second" search, this time by government officials in Denver, the determinative question is whether the search was unreasonable and therefore proscribed by the Fourth Amendment. The search was not unreasonable if Andrews did not have a legitimate expectation of privacy in the sealed package which was delivered to him. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

In *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), it was held that one has a legitimate expectation of privacy in a locked footlocker. Recently, the Court held that such an expectation of privacy also exists in an unlocked suitcase. *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979).

Here the search involved the opening of a sealed package addressed to Andrews and picked up by him at the airport. The mere surrender of the package to a carrier for shipment has been held not to forfeit the right to privacy in the contents of the package. *Ex Parte Jackson*, 96 U.S. 727, 24 L.Ed. 877 (1877); *Corngold v. United States*, 367 F.2d 1, 7 (9th Cir. 1966). Although the law permits the carrier's inspection of Andrews' package, the regulation providing this right may not be extended to remove all legitimate expectation of privacy from governmental intrusion into packages that have been shipped. *United States v. Kelly*, 529 F.2d 1365 (8th Cir. 1976). Certainly an individual's expectation of privacy in a sealed package is as legitimate as his expectation of privacy in an unlocked suitcase. *See Sanders*, 99 S.Ct. at 2592 n. 9. And *see United States v. Dien*, 609 F.2d 1038 (2d Cir. 1979) (by sealing marijuana inside a plain cardboard box, the defendants manifested an expectation that the contents would remain free from public inspection).

The majority states that Andrews could not have had an expectation of privacy in the package "after he had been informed by Agent Roth that it contained drugs." *Supra* at 652. However, Andrews did not know Roth was a government agent. Simply because an individual shares his privacy with a few others, it does not follow that he has voluntarily surrendered his legitimate expectation of privacy from improper governmental intrusion. *Mancusi v. DeForte*, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968). Thus, in *Katz v. United States*, 389 U.S. 347, 351–52, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967), the Court stated:

"What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment pro-

tection. See *Lewis v. United States*, 385 U.S. 206, 210, 87 S.Ct. 424, 17 L.Ed.2d 312, 315; *United States v. Lee*, 274 U.S. 559, 563, 47 S.Ct. 746, 71 L.Ed.2d 1202, 1204. *But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.* See *Rios v. United States*, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688; *Ex parte Jackson*, 96 U.S. 727, 733, 24 L.Ed. 877, 879." (Emphasis added).

Moreover, Andrews paid Agent Roth $50 to agree not to report the contents of the package to the police. In *Rakas*, 439 U.S. at 149, 99 S.Ct. at 433, the Court considered it relevant that in *Katz*, 389 U.S. at 352, 88 S.Ct. at 511, the defendant paid for his privacy:

"Likewise in *Katz*, the defendant occupied the telephone booth, shut the door behind him to exclude all others *and paid the toll, which* 'entitled [him] to assume that the words he utter[ed] into the mouthpiece [would] not be broadcast to the world.' *Id.,* [389 U.S.] at 352, [88 S.Ct. 507, at 512]. Katz . . . could legitimately expect privacy in the areas which were the subject of the search and seizure [he] sought to contest." (Emphasis added).

The *Rakas* Court also noted that in *Rios v. United States*, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960), the defendant had "hired" the taxicab, thereby distinguishing *Rios* from *Rakas.* 439 U.S. at 149 n. 16, 99 S.Ct. at 433 n. 16. In the instant case, Andrews similarly paid to maintain his privacy. Under these circumstances, I would hold that Andrews' expectation of privacy was legitimate and reasonable.

It is my opinion that this case is controlled by *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 2590–91, 61 L.Ed.2d 235 (1979). After noting that ordinarily a search must be *both* reasonable and pursuant to a properly obtained warrant, the Court said:

"[A] few 'jealously and carefully drawn' exceptions provide for those cases where the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate. See *United States v. United States District Court, supra* [407 U.S. 297] at 318 [92 S.Ct. 2125, at 2137, 32 L.Ed.2d 752]. But because each exception to the warrant requirement invariably impinges to some extent on the protective purpose of the Fourth Amendment, the few situations in which a search may be conducted in the absence of a warrant have been carefully delineated and 'the burden is on those seeking the exemption to show the need for it.' *United States v. Jeffers*, 342 U.S. 48, 51 [72 S.Ct. 93, 95, 96 L.Ed. 59] (1951). See *Chimel v. California*, 395 U.S. 752, 762 [89 S.Ct. 2034, 2039, 23 L.Ed.2d 685] (1969); *Katz v. United States, supra,* [389 U.S.] at 357, [88 S.Ct. 507, at 514]. Moreover, we have limited the reach of each exception to that which is necessary to accommodate the identified needs of society. See *Mincey v. Arizona, supra* [437 U.S. 385], at 393 [98 S.Ct. 2408 at 2414, 57 L.Ed.2d 290]; *United States v. Chadwick, supra* [433 U.S.] at 15 [97 S.Ct. 2476] (1977); *Coolidge v. New Hampshire, supra* [403 U.S. 443], at 455 [91 S.Ct. 2022 at 2032, 29 L.Ed.2d 564]."

In the case before us, the government admitted in oral argument that no exigencies were present and, after impounding the package, a warrant could easily have been obtained. While Roth's "knowledge" of the contents of the package, which is based on telephone information from Miami and not his own personal knowledge, provides ample probable cause, it cannot be a substitute for a search warrant. *Sanders* teaches us that:

"Where—as in the present case—the police, without endangering themselves or risking loss of the evidence, lawfully have detained one suspected of criminal activity and secured his suitcase, they should delay the search thereof until after judicial approval has been obtained. In this way, the unconstitutional right of suspects to prior judicial review of searches will be fully protected."

*Id.* at 2594.

In considering warrantless searches, we must be mindful of Mr. Justice Bradley's

admonition in *Boyd v. United States*, 116 U.S. 616, 635, 6 S.Ct. 524, 535, 29 L.Ed. 746 (1886), which is repeated in *Coolidge v. New Hampshire*, 403 U.S. 443, 454, 91 S.Ct. 2022, 2031, 29 L.Ed.2d 564 (1971):

> " '[I]llegitimate and unconstitutional practices get their first footing . . . by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.' "

I would affirm the district court's granting of Andrews' Motion to Suppress.