645 P.2d 325

**STATE of Idaho, Plaintiff-Appellant, Cross-Respondent,**

v.

**John Joseph PONTIER, Defendant-Respondent, Cross-Appellant.**

No. 13450.

Supreme Court of Idaho.

May 6, 1982.

92

David H. Leroy, Atty. Gen., Lynn E. Thomas, Sol. Gen., Myrna A. I. Stahman, Deputy Atty. Gen., Boise, for plaintiff-appellant, cross-respondents.

David W. Cantrill, Boise, for defendant-respondent, cross-appellant.

BAKES, Chief Justice.

The state appeals an order of the trial court granting a motion to suppress evidence in a criminal prosecution for the possession of controlled substances with intent to deliver. We reverse.

On August 23, 1978, Wayne Tellis, California State Narcotics Agent, spoke on the telephone with Glenn Ford, Special Agent in Charge of the Bureau of Narcotics for the State of Idaho. Tellis advised Ford that two individuals had delivered a package to the UPS center at Chico, California, and stated that they wanted to insure it for $1,000. The box was about 15″ × 12″ × 8″, and had the Pabst Blue Ribbon name and logo in blue, red and white. When the individuals were asked what the package contained, they informed the UPS agent that it was towels. Because the UPS agent was suspicious he opened the package and discovered that it contained a white powder substance and marijuana.

After the package was opened by the UPS employee, law enforcement officials were called in. Tellis went to the UPS center in Chico where he observed the package and identified the suspected drugs as being cocaine and marijuana. At the direction of Agent Tellis, the package was then resealed, additionally wrapped and addressed to Michael Stevens, manager of the Garden City UPS center, and forwarded to Garden City. Tellis then contacted Agent Ford in Idaho and relayed the above information.

After the package arrived in Garden City, Agents Ford and Bottger took possession of it from Michael Stevens at the Garden City UPS terminal on August 28, 1978, at ap-

proximately 1:00 p. m. The package was opened by Agent Ford and both Agent Ford and Agent Bottger looked inside and inspected the contents. The package was then resealed, and arrangements were made to have Agent Bottger deliver the package to the defendant addressee Pontier at the Taco Bell restaurant located at 2801 Overland. After unsuccessfully attempting to telephone the defendant that same day, Agent Bottger retained the package until approximately noon on the next day, August 29, 1978. At that time Bottger dressed up as a UPS driver, took the package to the Taco Bell restaurant, and delivered it to the defendant who accepted delivery of the package and signed the receipt.

After delivering the package, Bottger returned the UPS truck to UPS, changed his clothes, and then joined other agents who were surveilling the defendant at the Taco Bell restaurant. The surveillance team watched the activities of Pontier for between 60 and 90 minutes, during which time Pontier carried the package which he had received to a room located in the back of the premises, which Pontier entered through an outside entrance. The defendant remained in the back room for 10 to 20 minutes. He traveled between the business premises and the back room a number of times and made a trip to his pickup truck. Pontier then left the business premises and drove away in his truck. Bottger pursued the defendant, stopped and arrested him. Pontier was then taken back to the Taco Bell.

Immediately after the arrest of Pontier, Bottger appeared before a magistrate and presented an oral affidavit in support of his request for a search warrant. Bottger related the events surrounding the interception and delivery of the package. It is clear from the oral affidavit that Bottger had received information concerning the activities of the California agents only through his superior, Agent Ford, and that Bottger had no personal knowledge of the conversation between Ford and Tellis other than what Ford had told him. Bottger did indicate, however, that he had met Tellis before. Bottger also made no mention in the oral affidavit of the fact that he and Ford had looked into the package while at the Garden City UPS terminal. Search warrants were issued for both the Taco Bell restaurant and the defendant's pickup truck. The searches of both places revealed cocaine and marijuana.

On September 26, 1978, a preliminary hearing was held, and the defendant was bound over for trial. On October 31, 1978, Pontier filed a motion to quash the search warrants and to suppress the evidence on the basis that the search warrants were based upon unreliable hearsay. On December 22, 1978, the motion was heard in district court. The court denied the motion, finding that the testimony of Bottger was "sufficient for the magistrate to conclude that the source was credible and that there was a factual basis for the information furnished."

The defendant entered a plea of not guilty to both counts, and on August 16, 1979, a jury trial began. After the seating of the jury and the opening statement, the jury was excused and defense counsel made a Motion In Limine to "refrain from having [the prosecutor] or any of his witnesses at any time mention the fact that narcotic agents in this town opened the box at the UPS station." The motion was denied, and the prosecution began presenting its case. After the prosecution's first witness testified, the noon recess was taken. During the recess the court did additional research concerning the search of the box at the Garden City UPS center. The court then reconsidered its ruling on the motion *in limine*, and after hearing argument, the court decided to reverse its decision on the Motion to Suppress the Evidence. Applying the then very recent case of *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) in which the United States Supreme Court ruled a warrantless search of luggage to be unconstitutional, the district court concluded that the warrantless search of the package at the Garden City UPS Center by Agents Ford and Bottger was illegal. The evidence was suppressed, and the state now appeals that decision.

## I

■ The state asserts that the search of the package by the Idaho narcotics agents at the Garden City UPS terminal did not require a warrant and was not illegal because the package had already been legally searched and seized by law enforcement officials in California as a result of the private search by UPS. It is argued that following the seizure and forwarding of the package and contents by the California authorities, the package and contents remained in a state of "continuous seizure" through the time when the package and contents were received and inspected by the Idaho agents. We agree.

■ Analysis of the search involved here must begin with the initial search of the package by the UPS employee in California. It is firmly established that evidence obtained through a private search, even though wrongfully conducted, is not excludable under the fourth amendment unless government officials instigated the search or otherwise participated in a wrongful search.[1] *Burdeau v. McDowell*, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). *See* Annot. 36 A.L.R.3d 553 (1971 & Supp.). The recent plurality decision of the United States Supreme Court in *Walter v. United States*, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980), does not change that rule, except *perhaps*[2] where the private search has not placed the evidence in "plain view," so as to destroy the defendant's expectation of privacy.

In *Walter*, private parties opened a package carrying film containers which held obscene films. The films were unviewable without the aid of a projector; however, their nature was evidenced by various labels. The containers and films were turned over to the FBI, and the films were then viewed by FBI agents without first obtaining a warrant. A plurality of justices held that the warrantless viewing of the films violated the fourth amendment rights of the defendant. While the justices in the majority differed in their rationale behind the judgment, the plurality did agree that *Walter* was not a "plain view" case due to the unviewable nature of the films, and they strongly intimated that the result would have been different had it been a "plain view" case. As was stated by Justice Stevens and joined in by Justice Stewart: "Some circumstances—for example, if the results of the private search are in plain view when materials are turned over to the government—may justify the government's reexamination of the materials . . . ." 100 S.Ct. at 2402 (Stevens joined by Stewart); *see* 100 S.Ct. at 2404 (White joined by Brennan).

The instant case clearly presents a "plain view" situation. The UPS employees in California opened the package and examined the contents. On the basis of that examination, they called in law enforcement officials. The controlled substances were in "plain view" when California nar-

1. We do not by this statement question the propriety of the search by the UPS employee. When the appearance of a package offered for shipment, or other circumstances, excite the suspicions of a common carrier that the package may contain contraband, the carrier has the right to inspect the contents of the package. This right of inspection "is rooted in the rule of the common law that common carriers have the right to decline shipment of packages proffered in circumstances indicating contents of a suspicious, indeed of a possibly dangerous nature. Justification for the carrier's refusal is to be found in the exigencies of safeguarding life and property, and undeniably the frustration of criminality is likewise a worthy carrier endeavor. The imperatives of either objective may warrant inquiry by the carrier as to the contents of a parcel tendered for shipment; they

may suffice, too, to justify a reasonable inspection of the parcel to fulfill that purpose." *United States v. Pryba*, 502 F.2d 391, 399 (D.C.Cir. 1974), *cert. denied* 419 U.S. 1127, 95 S.Ct. 815, 42 L.Ed.2d 828 (1975) (footnotes omitted); *see United States v. Jennings*, 653 F.2d 107, 110 (4th Cir. 1981); *United States v. Edwards*, 602 F.2d 458, 463 (1st Cir. 1979); *Snyder v. State*, 585 P.2d 229, 231 (Alaska 1978); *State v. Carroll*, 111 Ariz. 216, 526 P.2d 1238, 1240 (1974); *State v. Pohle*, 166 N.J.Super. 504, 400 A.2d 109, 111 (1979); *People v. DeSantis*, 59 A.D.2d 257, 399 N.Y.S.2d 514, 516 (1977).

2. Given the division of the court in *Walter*, the opinions therein cannot be taken as providing a definitive statement of the present law on the subject.

cotics agent Tellis arrived. He seized the contraband by physically appearing and taking control over it and by ordering that it be resealed and forwarded to Idaho law enforcement officials in care of the manager of the Garden City UPS terminal. Idaho officials were then alerted by Tellis. The uncontradicted facts clearly show that the contraband was exposed to "plain view" as a result of the private UPS search, and that therefore the initial seizure of the contraband by California agent Tellis was not in violation of the fourth amendment.

The next question is whether the law enforcement officials, having thus legally seized the contraband, at any time lost custody of that contraband prior to the opening of the package by Agent Ford at the Garden City UPS center. If not, then no warrant was required for the Idaho agent to open the package, since the contraband which it contained still remained in police custody. It is argued by the defendant that government custody of the contraband was relinquished when the package containing the contraband was returned to UPS to be forwarded to the Garden City UPS terminal in care of its manager, Michael Stevens. However, it has been held in numerous cases similar to the one at bar that as long as the legally seized contraband is forwarded by law enforcement officials under controlled circumstances, governmental custody of such contraband remains intact. *United States v. Andrews*, 618 F.2d 646 (10th Cir. 1980), *cert. denied* 449 U.S. 824, 101 S.Ct. 84, 66 L.Ed.2d 26 (1980); *United States v. Ford*, 525 F.2d 1308 (10th Cir. 1975); *United States v. DeBerry*, 487 F.2d 448 (2d Cir. 1973); *United States v. Hillan*, 381 F.Supp. 1171 (N.D.Tex.1974); *Whittemore v. State*, 617 P.2d 1 (Alaska 1980); *McConnell v. State*, 595 P.2d 147 (Alaska 1979), *cert. denied* 444 U.S. 918, 100 S.Ct. 235, 62 L.Ed.2d 173 (1979); *People v. Hampton*, 115 Cal.App.3d 515, 171 Cal.Rptr. 312 (1981); *People v. Plantefaber*, 91 Mich.App. 764, 283 N.W.2d 846 (1979) *rev'd* on other grounds, 410 Mich. 594, 302 N.W.2d 557 (1981); *State v. Edwards*, 197 Neb. 354, 248 N.W.2d 775 (1977); *State v. Pohle*, 166 N.J. Super. 504, 400 A.2d 109 (1979); *People v.*

*Adler*, 50 N.Y.2d 730, 431 N.Y.S.2d 412, 409 N.E.2d 888 (1980) *cert. denied* 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980); *State v. Johnson*, 569 S.W.2d 808 (Tenn.1978); *State v. Billings*, 101 Wis.2d 663, 305 N.W.2d 171 (1981).

In the present case, the contraband was discovered as a result of the private search conducted by a UPS employee. California authorities lawfully seized the contraband in "plain view." The contraband was forwarded by direction of the seizing authorities to the manager of the UPS terminal in Garden City. Idaho agents were alerted by the seizing authorities concerning the identity and the forwarding of the package containing the contraband. The Idaho agents reasserted control over the package by taking delivery of it once it arrived at the Garden City UPS center. The forwarding of the contraband under those conditions was clearly done under "controlled circumstances," and therefore we hold that police custody of the contraband remained intact at the time Agent Ford reexamined the contraband at the Garden City UPS center.

The defendant argues that the package should have been specifically addressed for delivery to the Idaho authorities in order for the contraband to remain in police custody. However, in our view, the mode of delivery is not significant as long as the carrier is directed by the seizing authorities to forward the contraband to its intended destination with the understanding that authorities at the receiving end will reassert control over the contraband. Certainly, in the absence of evidence to the contrary, it must be presumed that a common carrier forwarding contraband at the behest of law enforcement officials will faithfully discharge its duties in that regard and will do nothing to impair police custody of the contraband. The circumstances of the present case clearly indicate that the contraband was forwarded with the understanding that Idaho authorities would reassert control over it in Garden City.

The district court declared Agent Ford's search illegal on the authority of *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979); however, that case is distinguishable. In *Sanders*, an informant told police that the defendant, upon arriving at an airport, would be carrying a green suitcase containing marijuana. After observing the defendant retrieve a green suitcase from the claim area and then enter a taxi, police seized the suitcase and searched it without a warrant. The search was held to be illegal. However, at no time had the contents of the suitcase come into either plain view or lawful custody of the police prior to the warrantless search as was the case here. In *United States v. Andrews*, 618 F.2d at 651, a case almost identical to the case at bar, the Tenth Circuit also found *Sanders* to be distinguishable when it stated:

> "In our view *Arkansas v. Sanders, supra*, ... and many other cases involving the validity of warrantless 'suitcase' searches do not apply to the facts and circumstances of the instant case. None of those cases involved, as here, initial private searches beyond the commands of the fourth amendment."

We conclude that the contraband in the present case was still in police custody at the time the package was opened by Agent Ford in Garden City, and therefore no search warrant was required.

## II

As an additional issue on appeal, the defendant questions the sufficiency of the oral affidavit of Agent Bottger upon which the warrants to search the Taco Bell restaurant and Pontier's vehicle were issued. In particular, it is argued that the magistrate's reliance upon the "third or fourth hand hearsay" contained in the oral affidavit was error. No mention was made in the oral affidavit of the inspection of the contraband by Agent Ford at the Garden City

UPS terminal. The district court ruled adversely to the defendant on this issue.

We have previously held that multiple hearsay is a permissible foundation upon which probable cause may be established, as long as the two-pronged test of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), is met as to each link in the multiple hearsay. Thus, in order to support a warrant issued solely on the strength of multiple hearsay, the supporting affidavit must (1) demonstrate the basis for each declarant's knowledge, and (2) establish each declarant's reliability or credibility. *State v. Alger*, 100 Idaho 675, 678, 603 P.2d 1009, 1112 (1979); *State v. Oropeza*, 97 Idaho 387, 391, 545 P.2d 475, 479 (1976).[3] The hearsay relied upon in the present case originated with Agent Tellis in California who observed, seized and forwarded the controlled substances following the private search by the UPS employee in Chico, California. Tellis related that information to Agent Ford in Idaho, who in turn communicated it to Agent Bottger, the affiant. Both informants, Tellis and Ford, were law enforcement officers. Bottger testified in the oral affidavit that he personally knew Agent Tellis, and that Agent Ford was his own supervisor. Law enforcement officials are presumed to be reliable sources of information, *State v. Gomez*, 101 Idaho 802, 807, 623 P.2d 110, 115 (1981); *State v. Alger*, 100 Idaho at 679, 603 P.2d at 1113, and there is nothing in the record to cast doubt upon the status of Tellis and Ford as law enforcement officials. The oral affidavit of Agent Bottger, therefore, sufficiently established the reliability of the informants. Likewise, the factual basis for the information was clear. Bottger testified in the oral affidavit that Agent Tellis's knowledge came from personal observation, and that Tellis informed Agent Ford, who in turn related it to Bottger. Consequently, we hold that the oral affidavit of Agent Bottger established sufficient probable cause to support the issuance of the search

---

**3.** I.C.R. 41(c), which codifies the rule in *Aguilar*, was not effective at the time this case arose and therefore is not applicable here.

warrants in this case.[4] The suppression order of the district court is reversed.

McFADDEN, DONALDSON and SHEPARD, JJ., concur.

BISTLINE, Justice, dissenting:

I cannot agree with the majority's adoption of a "continuous custody" exception to the warrant requirement. The package which was the subject of the suppression hearing below was searched, without a warrant, *five days* after agent Ford received information which, as the majority holds, was sufficient to secure a warrant. The Fourth Amendment was violated because "[i]t was a search; there was no warrant; the owner had not consented; and there were no exigent circumstances." *Walter v. United States,* 447 U.S. 649, 100 S.Ct. 2395, 2400, 65 L.Ed.2d 410 (1980).[1]

### I.

Before delving into the majority's "continuous custody" exception to the warrant requirement, I will briefly examine the nature of underlying privacy interest which was invaded by agent Ford's search. An appropriate starting point is *Walter v. United States, supra.* As the majority correctly states, *Walter* involved a private party opening packages which contained what later proved to be obscene film. The films were turned over to the FBI, which viewed them without a warrant. The Court in *Walter* did not decide the question of whether an initial, valid search obviates the need for a warrant when a second search is conducted at a later date. In fact the lead opinion in *Walter* specifically states that "[s]ince the viewing was first done by the Government when it screened the films with a projector, we have no occasion to decide whether the Government would have been required to obtain a warrant had the private party been the first to view them." 100 S.Ct. at 2402 n. 9 (per Justice Stevens, with Stewart, J., concurring). Two other members of the plurality, however, were

---

4. We note, however, that pursuant to the automobile exception to the warrant requirement, no warrant was necessary to search Pontier's vehicle, given probable cause to believe that it contained evidence of a crime. *State v. Bottelson,* 102 Idaho 90, 625 P.2d 1093 (1981). In the present case, it is clear that Agent Bottger had probable cause to search Pontier's vehicle without a warrant, since he had legally observed the controlled substances in the package sent to and accepted by Pontier, and had closely monitored Pontier's activities including various entries into the vehicle. Furthermore, a warrantless search of Pontier's vehicle would have been permissible in this case as a search incident to arrest under the recent United States Supreme Court decision in *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981).

1. Perhaps more important than the majority's holding itself is the disturbing trend which it indicates. In *State v. Gomez,* 101 Idaho 802, 623 P.2d 110 (1980), *cert. denied,* 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981), I voiced my strong objection to the Court's sanctioning of the nebulous "securing the premises" exception to the Fourth Amendment's warrant requirement. Today the Court takes another step away from its duty to safeguard individuals against abuses by the state of its police powers. Justice Bakes defended the terrible intrusion in *Gomez* on the basis that the "statute says nothing about the necessity of the warrant being present upon the initial entry. It

requires only the presence of the officer or officers directed to execute it." 101 Idaho at 809, 623 P.2d at 117. Doubtless, the same facile argument could be made as to the execution of an unserved death warrant, which most minds (including legal) would believe should be delivered to the warden prior to the warden's taking the life of the prisoner, as I.C. § 19–2705 seems to read. It is beyond dispute that warrants authorizing arrest are the *processes* of the court. If there were no requirement that warrants be in hand in order to validate their execution—and possibly save the lives of peace officers and innocent victims as well—*see State v. Mendoza,* 104 Ariz. 395, 454 P.2d 140 (1969) cited in *Gomez, supra,* 101 Idaho at 827, 623 P.2d at 135 (Bistline, J., dissenting)—the Court in its relentless and never-ending promulgation of rule upon rule on top of rule should adopt one, as I suggest in *Gomez.* However, with all due deference to the other members of the Court who joined in the relaxed *Gomez* views of Justice Bakes, I continue to believe it inescapable that common sense has already prevailed, in a legislative enactment which since 1864 has required that the officer exercising a warrant must upon request show it. I.C. § 31–2214. It is a mystery to me how the officer can show it (and perhaps save a life) if he doesn't have it. As the condemned man said as he was led to the gallows, "I'll be hanged if I know."

not so hesitant to express their views on that issue. Justice White wrote:

> "I write separately, however, because I disagree with Mr. Justice STEVENS' suggestion that it is an open question whether the Government's projection of the films would have infringed any Fourth Amendment interest if private parties had projected the films before turning them over to the Government, *ante*, at 2402, n. 9. The notion that private searches insulate from Fourth Amendment scrutiny subsequent governmental searches of the same or lesser scope is inconsistent with traditional Fourth Amendment principles." 100 S.Ct. at 2403 (per Justice White, with Brennan, J., concurring).

Even Justices Stevens and Stewart recognized that a privacy interest in packages delivered to a third party consignor does not "disappear" simply because a third party happens to view the contents of the package. "The fact that the cartons were unexpectedly opened by a third party before the shipment was delivered to its intended consignee does not alter the consignor's legitimate expectation of privacy." [2] 100 S.Ct. at 2402–03 (per Justice Stevens, with Stewart, J., concurring).

Privacy is by definition a subjective right. Rules which attempt to treat that right as if it were a tangible item, with measurable dimensions and characteristics, appearing one moment and disappearing the next, run contrary to the basic principle that "the Fourth Amendment protects people, not places." *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). The reasonable expectation of privacy which both the consignor and the consignee had in the package which was entrusted to UPS in this case necessarily included the expectation that it would be delivered, unopened, to the person to whom it was addressed. While the UPS official may have had the right to open and inspect the package, *regardless* of anyone's expectation of privacy, and while the agent in California may have had the right to view that which was plainly to be seen, *regardless* of anyone's expectation of privacy in it, the privacy interest did not disappear, the privacy interest simply did not preclude conduct which was not constitutionally prohibited. In *People v. Riegler*, 127 Cal. App.3d 317, 179 Cal.Rptr. 530 (1981), the court held, as to the privacy interest in packages which had been legally searched by customs agents and then delivered:

> "We reject for two reasons the argument that appellant had no reasonable expectation of privacy in the packages because the packages had been subject to an earlier customs search. First, as explained by the United States Supreme Court in *Walter v. United States*, 447 U.S. 649, 100 S.Ct. 2395, 2402, fn. 12, 65 L.Ed.2d 410 (lead opn.): '... it is difficult to understand how petitioners' subjective expectation of privacy could have been altered in any way by subsequent events of which they were obviously unaware.' Second, even assuming appellant had a lesser expectation of privacy in the packages because they were opened in New York, the diminution of privacy ended when the packages were delivered by the police to the Merced address. The police fully understood this as evidenced by the fact they obtained a search warrant for the packages at the Merced address." 179 Cal.Rptr. at 535.

The California court's reading of *Walter* is sound and that the Court refuses to follow it may be to some a bit startling.

## II.

The majority, of course, does not assert that there was no legitimate expectation of

---

**2.** Justice Stevens goes on to add, in a footnote, that "[i]t is arguable that a third party's inspection of 'private books, papers, memoranda, etc.' could be so complete that there would be no additional search by the FBI when it reexamines the materials." 100 S.Ct. at 2403 n. 14. While this point may be "arguable," to my mind it must be resolved in a manner that extends the maximum amount of protection feasible to the privacy interests involved. Thus privacy interests should be presumed whenever there is any question on that issue and the analysis should proceed to whether any recognized exception to the warrant requirement justified the warrantless search.

privacy in the package. Rather it states that the package at all times remained in the "custody" of the law enforcement officials, and concludes that this fact somehow obviates the need for *agent Ford*, who had received his information only by telephone, to obtain a search warrant. The fact that agent Tellis in California had the authority to lawfully search and seize the package in California does not mean that the same authority somehow vicariously extended to all other law enforcement officials in the United States. Tellis' authority arose out of, and was limited to, the facts that were present at the time that he viewed the package—the facts peculiar to *that* case.

The indiscriminate lumping together of law enforcement officials, as if each had authority identical to all others, is a dangerous approach to evaluating claims of constitutional violations. For example, if agent Ford had received his information from an absolutely reliable source who was not a police officer, would he have been justified in searching the package without a warrant? Certainly not. Does the fact that agent Ford received his information from a fellow law enforcement official change the outcome? Certainly not. *See State v. Oropeza*, 97 Idaho 387, 545 P.2d 475 (1976); *State v. Gomez, supra* note 1. It is the actions of agent Ford which are complained of, and those actions must be evaluated, not by a post-arrest comparison of events with the accuracy of the information which he received, but rather by an examination of whether he, as an agent of the state at the time that he made his warrantless search of the package, had a legitimate reason for proceeding without a warrant.

> "[A] few 'jealously and carefully drawn' exceptions provide for those cases where the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate. . . . But because each exception to the warrant requirement invariably impinges to some extent on the protective purpose of the Fourth Amendment, the few situations in which a search may be conducted in the absence of a warrant have been carefully delineated and 'the burden is on those seeking the exemption to show the need for it.' *United States v. Jeffers*, 342 U.S. 48, 51 [72 S.Ct. 93, 95, 96 L.Ed. 59] (1951). See *Chimel v. California*, 395 U.S. 752, 762 [89 S.Ct. 2034, 2039, 23 L.Ed.2d 685] (1969); *Katz v. United States supra*, [389 U.S.] at 357 [88 S.Ct. at 514]. Moreover, we have limited the reach of each exception to that which is necessary to accommodate the identified needs of society." *Arkansas v. Sanders*, 442 U.S. 753, 759–60, 99 S.Ct. 2586, 2590–91, 61 L.Ed.2d 235 (1979) (some citations omitted) (footnote omitted).

I can discern no compelling need for proceeding without a search warrant in this case. A compelling need is not demonstrated by the State, and the Court has neither found nor fashioned one. Both simply cite to a string of lower court cases which hold that, so long as a package or other protected item remains in "governmental custody,"[3] there is no need for individual officers, acting on a telephonic communication from a person who alleges that they are acting on behalf of the government, to obtain a warrant prior to searching the package. While many of these cases can be distinguished on their facts, it would serve no purpose to do so here. Suffice it to say that the Supreme Court has not yet ruled on the constitutionality of law enforcement officials acting in such a manner, and I am confident that when the Court does address this practice, it will strike it down. If it does not, the people are in for the same hard times that were visited on the unoffending Mrs. Gomez and her infant daughter. The cases, including this one, which uphold the "continuous custody" exception to the warrant requirement, run directly contrary to the Supreme Court's announced position that searches which may be conducted without a warrant at one point in time *may not* be conducted without a warrant if sufficient time has elapsed to allow

---

**3.** This term apparently includes private individuals acting under "controlled circumstances."

a warrant to be obtained. *See Arkansas v. Sanders, supra.* As stated in *People v. Riegler,* 127 Cal.App.3d 317, 179 Cal.Rptr. 530, 536 (1981),

"Having the right under *Belton* to open the packages when appellant was arrested, the question naturally arises: why should the officers be required to get another warrant to open the packages at their later convenience? The answer, of course, is that the Constitution, as interpreted by the high courts of our land, mandates a warrant be obtained unless there are exigent circumstances. Probable cause, although it may be overwhelming, is not enough; it is a neutral magistrate and *not* the police that determines if private packages may be searched."

Because I see no reason or excuse other than mere convenience for not obtaining a search warrant prior to searching the package in Garden City,

*I dissent.*